Argued March 28, affirmed April 10, 1928.

## BANK OF FALLS CITY *v.* MARY A. PUGH ET AL.

(266 Pac. 233.)

**Mortgages—Grantee's Verbal Promise to Pay Mortgage as Part of Consideration is Valid and may be Enforced.**

**1.** Verbal promise by grantee of land to pay mortgage on it as part of consideration of purchase is valid and may be enforced in equity.

---

1. What amounts to assumption of mortgage by grantees and their liability thereunder, see note in 78 **Am. Dec.** 73. See, also, 19 **R. C. L.** 381. Parol evidence in relation to assumption of mortgage debt by grantee of mortgaged property, see note in 50 **A. L. R.** 1220.

**Mortgages—Grantee's Verbal Promise to Pay Mortgage as Part of Consideration must be Clearly Established.**

2.   Verbal promise by grantee of land to pay mortgage as part of consideration of purchase must be clearly established by convincing testimony.

**Mortgages—Mortgagee Claiming Grantee had Verbally Assumed Mortgage had Burden of Proving Such Agreement and That It was Made Prior to Conveyance.**

3.   Mortgagee claiming that grantee had made verbal promise to pay mortgage on land as part of consideration for purchase had burden of proving such agreement and that it was made prior to conveyance.

**Mortgages—Evidence Held Sufficient to Establish That Grantee Made Verbal Promise to Pay Second Mortgage on Land to Grantor's Wife as Part of Consideration of Purchase.**

4.   In action by holder of first mortgage to foreclose same, in which wife of mortgagor, holding second mortgage, filed cross-complaint against grantee of property, evidence *held* sufficient to establish that grantee made verbal promise to pay second mortgage to grantor's wife as part of consideration of purchase.

---

Mortgages, 41 **C. J.,** p. 723, n. 62, p. 730, n. 77.

From Polk: W. M. RAMSEY, Judge.

Department 1.

This was a suit originally begun against the defendants for the foreclosure of a mortgage given by defendants Clifford J. Pugh and Mary A. Pugh to one C. S. Smith and dated March 5, 1921, to secure the payment of a promissory note for the sum of $3,000 payable one year after date with interest at the rate of 8 per cent per annum, which note and mortgage were signed and executed by said Mary A. Pugh under the name of "Mollie Pugh" and which were afterwards sold and assigned by Smith on July 3, 1922, to the plaintiff Bank of Falls City and the note indorsed by defendant Griswold.  There were certain credits upon the note which reduced it to about the sum of $2,500 at the date of the bringing of

---

2.   See 19 **R. C. L.** 381, 382.

this suit, the amount due not being in controversy here.

It was further alleged that on April 15, 1922, Mary A. Pugh conveyed all her interest in the land described in the complaint to Clifford J. Pugh; that thereafter on the twenty-second day of April, 1, 1922, said Clifford J. Pugh executed a mortgage upon the land described in favor of Mary A. Pugh, which was intended to be a second mortgage thereon; that thereafter on the eighth day of June, 1922, Mary A. Pugh secured a decree of divorce from Clifford J. Pugh; that on June 8, 1922, Clifford J. Pugh conveyed the land described in the complaint to Graham A. Griswold, and that said Griswold is still in possession thereof. Plaintiff prayed for the usual decree in such cases.

All the parties defendant substantially made default as to the original complaint, but Mary A. Pugh answered by a cross-complaint against Griswold alleging by said complaint, as amended on trial, as follows:

"That heretofore on a certain day, to-wit, on April 22, 1922, at Dallas, Polk County, Oregon, one Clifford J. Pugh, defendant above named made, executed and delivered to this answering defendant his certain promissory note, which said promissory note is in words and figures as follows:

"$3300.00. Dallas, Oregon, April 22, 1922.

"On or before five years after date I promise to pay to the order of Mary A. Pugh at Dallas, Oregon, Thirty Three hundred Dollars in Gold Coin of the United States of America, with interest thereon in like Gold Coin at the rate of six per cent per annum from maturity until paid, for value received, interest payable semi-annually and if not so paid then the whole sum of both principal and interest to become immediately due and payable at the option of the holder of this note. And in case suit or action is in-

stituted to collect this note or any portion thereof, I promise to pay such additional sum as the court may adjudge reasonable as attorney's fees in said suit or action. Principal hereof payable in semi-annual installments of not less than $300.00.

"CLIFFORD J. PUGH.

"66c. I. R. S. Cancelled on original."

It is further alleged that Clifford J. Pugh executed his mortgage on the land described in the complaint on said date to secure said note. It was also alleged, by an amendment to the original cross-complaint, that on June 5, 1922, said Pugh sold the land described in the complaint to Graham A. Griswold and executed a deed of conveyance to the same "which said deed of conveyance contained a provision that said conveyance was made subject to the mortgage in the complaint of plaintiff mentioned and described, also subject to the mortgage herein mentioned, and the grantee in said deed of conveyance Graham A. Griswold, defendant herein, assumed said mortgages, and each of them agreed to pay the same as part of the consideration for said conveyance."

By stipulation of the parties appearing, it was agreed that the bank should take a decree in its favor as to the Smith mortgage leaving the litigation so far as it related to Mrs. Pugh and Griswold to further litigation.

Griswold answered, putting in issue the fact of his assumption of Mrs. Pugh's mortgage, and upon the trial the court found in her favor upon the contention thus raised and rendered a decree accordingly, from which defendant Griswold appeals.    AFFIRMED.

For appellant there was a brief over the names of *Mr. Oscar Hayter* and *Mr. R. S. Kreason*, with an oral argument by *Mr. Hayter*.

For respondent there was a brief over the name of *Messrs. Brown & Harcombe,* with an oral argument by *Mr. W. W. Harcombe.*

McBRIDE, J.—1-3. It is settled in this state, and by the weight of authority elsewhere, that a verbal promise by a grantee of land to pay a mortgage upon it as a part of the consideration of the purchase is valid and may be enforced in equity: *Knighton* v. *Chamberlin,* 84 Or. 153 (163 Pac. 703). It is equally well settled that such an agreement must be clearly established by convincing testimony. So far, both counsel in this case are in accord leaving to the court the sole question of determining whether the alleged agreement in this case has been established by the modicum of testimony required in cases of this character and bearing in mind the rule that the cross-plaintiff in this case has the burden of proof not only to show that such agreement was made but that it was made prior to the conveyance.

4. Looking at the situation in this case, it is fair to say that in 1922 Pugh had become involved in debts, several thousands of dollars of which he owed to the Bank of Falls City, about $2,000 or more secured by a deposit of shares of the Falls City Canning Company, and that his stenographer, whom he seems to have felt in duty bound to protect, owed the bank a note of about $900, also secured by a deposit of ten shares of cannery stock; that he owed a debt, the amount not stated, to Ladd & Bush of Salem, but evidently considerable, and about $1,000 to the Dallas Bank. Whether these latter debts were secured by deposits of cannery stock does not clearly appear, but it does appear that the defendant Griswold considered the payment of these debts necessary in

order to get a clear title to the stock, which he and others for whom he was acting, or expected to act, were proposing to purchase.

In addition to the above-mentioned debts, Pugh owed C. S. Smith $3,000 on a promissory note secured by mortgage upon the land described in the complaint, and owed Mary A. Pugh the note for $3,300, heretofore described in the complaint, which note was also secured by a mortgage upon the same tract of land. He had separated from his wife and was evidently desirous of cleaning up his affairs at Falls City, where he had theretofore been somewhat active in business, and betaking himself "to fresh fields and pastures new."

In this condition of affairs negotiations were begun between Pugh and Griswold for the purchase, as Griswold claims, mainly of the cannery stock, but, as Pugh claims, of his cannery stock and entire interests in and about Falls City. The witnesses all show a very defective memory for details. Pugh claims to be unable to state definitely how much cannery stock he had and Griswold's memory is equally defective. A small matter of seven or eight hundred dollars' worth of stock seems an infinitesimal matter in their memories, but we approximate the amount, including Miss Marshall's shares, at about 8,000 shares at the par value of $100 a share for which the purchasers contemplated paying 85 cents on the dollar or $6,900, the amount to be paid by taking up Pugh's several indebtedness and, as he says, assuming the mortgages, and, as he contends, paying them.

The negotiations between Griswold and Pugh, which seem to have involved primarily the purchase of his cannery stock and incidentally his other holdings in and about Falls City, began some time in May, 1922,

and, while at first oral, were followed up by a letter from Griswold to Pugh of which the following is a copy, the "Cliff" mentioned in the letter being defendant Clifford J. Pugh and the "Graham" being Graham Griswold.

"Cliff:

"As soon as you left I phoned Falls City to see if they would pay 85 and Al Courter phoned me, a few moments ago, he felt sure enough stock could be sold to permit me to handle the balance so I believe you can figure on a sale.

"As soon as I get to Falls City will get busy, get Mr. Beard over and get the money together as fast as we can to pay you. It may, as I said last week, take some time to get things together but will hurry and let you hear from me first of week. As I understand it anyway we are simply to handle our obligations so it will be up to us to raise enough to take care of L & B, Dallas Bank, Smith on the farm and bank of F. C. for your loan on top of which settle with Lillian—Meantime get your books in good shape so everything can be easily checked both as to stock we have on hand and assets and liabilities also the growers account and I will get in touch with you just as soon as possible next week.

"I also wish you would arrange to give me all the dope you can on costs and price on actual sales. I hope to learn the cannery business make a little money and help Falls City, and above all, work in harmony with you and Mr. Paulus. Tell him we want all he will give us.

"GRAHAM."

Both parties lay great stress upon the words, "As I understand it anyway we are simply to handle your obligations." Pugh says that it was proposed, in the oral negotiations, that Griswold was to take his and Miss Marshall's stock at eighty-five cents on the dollar, take the land mortgaged to Smith and Mrs.

Pugh and assume and pay all the mortgages. Griswold, in substance, says that the mortgage to Mrs. Pugh was never mentioned; that he never agreed to assume that one or the Smith mortgage, but that the land was simply taken subject to the Smith mortgage without assuming it. It seems evident that Griswold contemplated buying Pugh's interest in the land and paying off at least the Smith mortgage as shown by the paragraph immediately following the one last above quoted, which reads as follows:

*"So it will be up to us to raise enough to take care of L & B, Dallas Bank, Smith on the farm* and bank of F. C. for your loan on top of which settle with Lillian."

One would be inclined to expect, if Mrs. Pugh's mortgage had been discussed between the parties before writing this letter, it would have been mentioned in the letter as one of the "obligations," which Griswold was to assume, and its omission tends somewhat to support Griswold's theory that it was not mentioned by Pugh. On the other hand, it is suggested by counsel for cross-plaintiff that it was in contemplation of the writer of the letter that it would be necessary only to raise *immediately* the money to pay obligations mentioned then due or overdue; that all the obligations mentioned were of that character, and, as Mrs. Pugh's note and mortgage were not then due, there was no reason why it should be referred to. In any event, the letter was in general terms, and was not in itself an offer to contract, but was only a link in the chain of negotiations as shown by the subsequent paragraph, which reads thus:

"Meantime get your books in good shape so everything can be easily checked both as to stock we have

on hand and assets and liabilities also the growers account."

If the case rested solely on Pugh's testimony and this letter taken in connection with Griswold's testimony, we would hesitate to say that cross-plaintiff had made out a case. But outside of this, and outside of oral testimony hereafter to be noted, there are independent circumstances, which tend to sustain cross-plaintiff's contention and which indicate that Griswold was desirous of getting hold of Pugh's stock and incidentally of the farm. It is possible that Griswold and his associates preferred some other person than Pugh, whose conduct in social respects seems not to have been altogether laudable and who was burdened with overdue debts, to be a permanent stockholder in their institution. Griswold evidently placed considerable value on the stock and on the farm, as is shown by Griswold on July 3d, shortly after the purchase of the farm, indorsing Pugh's note for $3,000 to Smith, making a payment of $500 thereon, continuing to pay the interest up to December, 1924, and further paying installments on Mrs. Pugh's note up to the sum of $1,200. If, at the time of the purchase of Pugh's stock, he regarded the farm as of little or no value and himself not obligated to pay these sums and risk his credit to keep the farm, he would not be the business man his testimony shows him to be. If he only discovered that a mortgage of $3,300 had been foisted off on him, when he received the deed from Pugh, it would seem that there would have been some protest or effort *then* to have the contract rescinded. Instead of this, he would have us believe that he calmly "took up the white man's burden" and paid Mrs. Pugh her installments on the mortgage to

the extent of $1,200 before he refused to go further. This may be true, but it does not sound reasonable.

Added to these circumstances is the apparently fair and disinterested testimony of Mr. Beard, who was present at the closing up of the contract between Griswold and Pugh and who testified that both the Smith and Mrs. Pugh's mortgages were included in the deal. The contract was concluded several years before the trial of this case and he naturally could not detail all the circumstances. He was a careful and cautious witness, who was evidently seeking to relate the facts as he remembered them, and he seemed very certain that these two mortgages (the Smith and Mrs. Pugh's mortgages) were included in the deal. We are convinced that he was right in this matter and his testimony, taken with the circumstances before adverted to, satisfy us that the decree of the Circuit Court was correct.

The decree is affirmed.       AFFIRMED.

RAND, C. J., and COSHOW and ROSSMAN, JJ., concur.