Argued June 5, affirmed as modified August 14, petition for
rehearing denied September 12, 1951

## STOTTS *v.* JOHNSON and MARSHALL

234 P. 2d 1059
235 P. 2d 560

*Warde H. Erwin,* of Portland, argued the cause for appellant. On the brief was Lee A. Ellmaker, of Portland.

*C. E. Wheelock,* of Portland, argued the cause for respondent. On the brief were Wheelock & Hathaway and C. R. Richardson, all of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN and LATOURETTE, Justices.

ROSSMAN, J.

This is an appeal by Arthur Johnston (erroneously entered in the title of this case as Art Johnson), one of the two defendants, from a decree of the Circuit Court. The suit which culminated in the decree was instituted by the plaintiff-respondent, Roy O. Stotts,

for the purpose of obtaining the foreclosure of a bill of sale alleged to be, in truth, a chattel mortgage. That instrument described a tractor owned by Earl L. Marshall, one of the two defendants, who was the transferor in the bill of sale. The plaintiff was the transferee. The complaint alleged that the bill of sale was executed to secure payment to the plaintiff of a debt of $6,000 owing by Marshall to the plaintiff. It also alleged that the plaintiff, in order to preserve his interest in the tractor, was compelled to pay on July 23, 1948, to the Federal Collector of Internal Revenue $1,320.71, the amount of a delinquent tax owing by Marshall. The defendant-appellant, Johnston, purchased the tractor from Marshall May 29, 1946. After the institution of this suit, and by virtue of a stipulation signed by the parties, one D. T. Wonderly, who had purchased the tractor from Johnston, deposited the sum of $9,000 with the clerk of the court as a substitute for the tractor. The record indicates that the deposit belongs, in fact, to Johnston.

The decree (1) granted the plaintiff judgment against Marshall in the amounts of $6,000 and $1,320.71, together with interest on each of those sums, and (2) directed the clerk of the court to pay to the plaintiff out of the fund of $9,000, which Wonderly had deposited with the clerk, the amounts just mentioned and deliver the remainder to Johnston.

In January of 1946 defendant Marshall, who is not an appellant, owned the tractor. The latter was then encumbered with a chattel mortgage held by one Otto W. Heider which secured payment of a promissory note upon which there was due January 26, 1946, $5,820. When Heider demanded payment and Marshall was unable to meet the demand, the plaintiff, at the

request of Marshall, paid Heider $5,820 January 26, 1946, and received the canceled note and mortgage. Concurrently therewith the plaintiff received from Marshall a bill of sale which described the tractor. The complaint avers, and the findings of fact declare, that the bill of sale was intended to serve as a chattel mortgage and secure to the plaintiff repayment of the aforementioned sum of $5,820 together with payment to him of the value of some services rendered by the plaintiff to Marshall. The total due to the plaintiff on account of those items, as found by the findings of fact, was $6,000.

Prior to May 29, 1946, Marshall offered to sell the tractor to defendant-appellant Johnston, and in so doing made representations concerning its condition which, stated succinctly, were that the tractor was in good mechanical condition. May 29, 1946, Johnston purchased the tractor and received from Marshall a bill of sale. One of the latter's warranties, in referring to the tractor, said: "Free from all encumbrances except a note held by Roy Stoots." The name "Stoots" was erroneously entered when the plaintiff's name "Stotts" was intended.

During the trial Johnston contended that (1) the relationship between the plaintiff and Marshall was not that of creditor and debtor, as claimed by the plaintiff, but that of co-venturers; (2) Marshall, in order to induce him (Johnston) to purchase the tractor, falsely represented to him that the tractor was in good working condition; (3) Marshall's representations were false; (4) since the plaintiff and Marshall were co-venturers (according to Johnston), the plaintiff was chargeable with Marshall's purportedly false representations; and (5) if Marshall was indebted to the

plaintiff in any amount whatever, apart from the indebtedness arising out of the plaintiff's payment of Marshall's delinquent income tax, the amount was not $6,000, as the plaintiff claimed, but no more than $4,000.

Before Johnston purchased the tractor he was aware of the fact that Marshall was delinquent in the payment of his Federal income tax. For instance, referring to Marshall, Johnston testified: "He told me he owed money to the Internal Revenue and to the State, and, gosh, I wouldn't remember who all." Shortly after Johnston purchased the tractor the following, according to him, occurred: "The Internal Revenue placed some seizure notices on this tractor." When the Federal Collector of Internal Revenue seized the tractor he also took into his custody some other logging equipment which Marshall owned, including a donkey engine. The record does not indicate exactly the amount of Marshall's delinquent tax but it approximated $3,500. We notice from Johnston's testimony that upon one occasion he offered to pay the Collector $2,200 of the tax if the Collector would release to him the donkey engine. Johnston's exact words were: "I offered to pay $2,200, plus, to the Bureau of Internal Revenue to release the lien on that donkey." The offer was refused and, according to Johnston, he received the following explanation: "They couldn't accept that money, that donkey was seized and it must be sold at auction."

After Johnston's conditional offer to pay $2,200 of the delinquent tax had been rejected, some of Marshall's equipment which had been seized by the Collector was sold, but a balance of $1,320.71 remained uncollected upon the tax. In the meantime, the tractor remained under seizure and was transported by the

Collector to Portland where preparations were under way for its sale. At that juncture the plaintiff paid to the Collector $1,320.71, the unpaid balance of the tax.

It will be recalled that the decree awarded the plaintiff judgment not only for $6,000, the amount secured by the bill of sale, but also for $1,320.71. The foregoing is a condensed explanation of the two amounts.

The findings of fact entered by the Circuit Court state:

"The Defendant Earl Marshall is indebted to the Plaintiff in the amount of $6,000.00, together with interest thereon from and after January 26, 1946, together with the further sum of $1,320.71, paid by Plaintiff to the Collector of Internal Revenue to prevent the sale of a certain D-8 Diesel Caterpillar tractor and equipment, together with interest on said latter sum from and after July 23, 1948.

"The bill of sale made and executed by the Defendant Earl Marshall conveying to the plaintiff the D-8 Diesel Caterpillar Tractor and equipment and dated January 26, 1946, was and is a mortgage given to secure the payment of the $6,000.00 described in Paragraph (1) above. That the said bill of sale was a chattel mortgage on the said tractor and equipment on July 23, 1948, the date of the payment of the tax lien thereagainst by the Collector of Internal Revenue.

"The Defendant Art Johnson was not an innocent purchaser of the D-8 Diesel Caterpillar Tractor and equipment as to the lien of the Plaintiff and that the Defendant's interest in said tractor is subsequent in time and inferior in right to Plaintiff's lien."

We shall now consider the first assignment of error which reads as follows:

"The court erred in finding that the payment of $1,320.00 to the Collector of Internal Revenue

by respondent Stotts was a proper payment to protect his lien.''

It will be remembered that the plaintiff paid the balance ($1,320.71) of Marshall's Federal income tax after it had become delinquent and after the Collector of Internal Revenue had seized the tractor. Volume 59, C.J.S., Mortgages, § 325(b), at page 445, says:

"A mortgagee paying taxes on the mortgaged premises acquires a lien which is a charge thereon additional to the original mortgage lien.''

In support of his assignment of error, Johnston declares:

"Money properly and necessarily paid by a chattel mortgagee to protect his rights is proper but in this case the U. S. Government did not have a proper or valid lien as far as appellant Johnson was concerned and the said payment was not a valid debt.''

He adds:

"The lien could be valid if appellant Johnston had actual knowledge of the lien prior to the sale of the tractor to him.''

The basis for the assertions is a contention that the Government's notice of lien claim was not filed in the right county.

Act of Congress of March 4, 1913, Vol. 37 Stat. 1016 (26 U.S.C.A. Int. Rev. Code §§ 3670–3677) provides:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount shall be a lien in favor of the United States from the time when the assessment list was received by the collector, except when otherwise provided, until paid, * * *. Provided further, whenever any state by appropriate legislation authorizes the filing of such notice in the office of the registrar or

recorder of deeds of the counties of that state, or in the State of Louisiana in the parishes thereof, then such lien shall not be valid in that state as against any mortgagee, purchaser, * * * until such notice shall be filed in the office of the registrar or recorder of deeds of the county or counties, * * * within which the property subject to the lien is situated.''

Pursuant to the privileges granted by that act, this state adopted the Uniform Federal Tax Lien Registration Act, Oregon Laws 1941, chapter 43, page 73, which makes provision whereby Federal tax lien notices may be filed in the office of the county recorder in counties which have such an office and in the office of the county clerk in all other counties. Section 1 of the act says that the notice must be filed in the county ''within which the property subject to such lien is situated.''

Johnston contends that the tax lien notice was filed in Lane County and that the evidence fails to show that the tractor was in that county when the notice was filed. There is no direct evidence that the Government filed a tax lien notice in any county. Two oblique references made by witnesses to a tax lien may have been intended to refer to a tax notice, but no witness used the term ''lien notice'', and none said that such a document was filed anywhere. However, since Johnston predicates his appeal upon a positive statement that a tax lien notice was filed, we shall for the sake of convenience assume that one was filed in one of this state's counties. The evidence wholly fails to indicate (1) in which county the lien notice was filed; (2) when it was filed; and (3) where the tractor was located when the filing occurred.

Johnston seeks to supply the void just mentioned by resort to a judicial utterance of which we will now take notice. Six months after the Circuit Court entered the decree which Johnston challenges, the District Court of the United States for the District of Oregon filed a document entitled "Opinion" in an action pending in that court and entitled *Art Johnston v. United States of America*. The brief of the defendant-appellant (Johnston) in the case at bar states that he was the Art Johnston who was the plaintiff in the case in the Federal court. The opinion indicates that *Johnston v. United States* was a tort action brought by Johnston to recover damages for an alleged wrongful seizure by employees of the Government of "a tractor." The opinion mentions "Tax Lien No. 12609" and declares that the Government employees who seized the tractor were endeavoring to enforce payment of the tax upon which the lien notice was based. Since the opinion was not written until four months after the notice of appeal in the instant suit was given, nothing whatever was said or done about the opinion in the trial court and, accordingly, the record does not disclose whether "the tractor" mentioned in the opinion is the one which Marshall sold to Johnston, and likewise does not show whether "Tax Lien No. 12609" is the one which the plaintiff discharged by the payment of $1,320.71 on July 23, 1948. The opinion says:

> "There was no competent evidence to the effect that the tractor was in Lane County at the time the tax lien was filed.  *  *  *  Was the tax lien filed in Lane County a valid and subsisting lien in Columbia County, where the tractor was seized on July 10, 1948? The court has decided that the tax lien was not of record in Lane County at the time that the tractor was physically in said county."

In lieu of evidence showing that the lien notice was filed in the wrong county, Johnston asks us to accept the statement just quoted.

The plaintiff in the case before us (Stotts) was not a party to the action in the Federal court which resulted in the entry of the opinion upon which Johnston relies. Res adjudicata was not plead in this suit. We have no information concerning the case in the Federal court except that which is afforded by the terse opinion which we have mentioned. We know nothing about the eventual outcome of that case, and do not know whether a judgment has been entered in it.

■■ We think that it is obvious that the opinion filed in the Federal court in *Art Johnston v. United States of America* can not be deemed evidence in this case. The reasons are numerous, and it is unnecessary to mention any of them. Likewise, we think it is obvious that that opinion cannot be deemed res adjudicata of any issue in this case.

In arguing that the assignment of error under consideration lacks merit, the plaintiff contends that the answer admitted the validity of the tax lien which he discharged July 23, 1948.

The complaint alleged:

"The tractor above described was prior to the date hereof taken and reduced to the possession of the Collector of Internal Revenue upon the ground and for the reason that the defendant Earl L. Marshall had failed and neglected to pay certain taxes to the United States Government. That said tractor was subject to sale and in order to forestall sale of said tractor and to protect plaintiff's interest and lien thereon, plaintiff did on the 23rd day of July, 1948, pay to the Collector of Internal Revenue the sum of $1,320.71 in full for said taxes with the interest, penalty and other charges thereon."

That averment constituted Paragraph V of the complaint. The answer stated:

"Answering Paragraph V of said complaint, defendant admits the allegations thereof."

The complaint was attacked by neither motion nor demurrer. During the trial no contention was made that any averment of the complaint was defective.

It will be observed that the complaint did not mention a tax lien notice and did not say that such a document had been filed. Likewise, the complaint did not disclose the exact time when the tractor was seized, but the contention advanced by Johnston and now under consideration admits that a tax lien notice was filed.

■ Section 1-902, O.C.L.A., says:

"In the construction of a pleading for the purpose of determining its effect, its allegations shall be liberally construed, with a view of substantial justice between the parties."

That section of our laws supplanted the rule of strict construction which was employed at common law: *Griffith v. Hanford*, 169 Or. 351, 128 P. 2d 947. As held in the decision just cited, the rule now employed is one of "fair notice to the opposing side and to the court." Under statutes similar to the one just quoted, construction attributes to the pleading all facts which can be implied by fair and reasonable intendment from those expressly averred; provided, of course, that judicial construction never places upon any pleading a meaning contrary to its express language: 71 C.J.S., Pleading, § 54, p. 123.

We believe that Paragraph V of the complaint, when fairly construed, avers that (1) before the seizure of the tractor Marshall was indebted to the Government upon a delinquent tax; (2) before the plaintiff

discharged the unpaid balance of Marshall's delinquent tax the Collector had seized the tractor and had taken it into his custody on account of Marshall's default; (3) the seized tractor was subject to sale by the Collector; and (4) in order to protect his interest in the tractor and to prevent the latter's sale by the Collector, the plaintiff paid to the Collector Marshall's delinquent tax.

■ We have seen that construction attributes to a pleading all facts which can be implied by fair and reasonable intendment from the facts expressly alleged. Obviously, the Collector could not have seized the tractor lawfully unless the tax was valid and the tractor could not have been "subject to sale" unless the Government possessed a valid lien upon it. The filing of a notice of the tax lien in the right county was essential to the validity of the lien when it was sought to attribute notice of the latter to third parties. We think that when Paragraph V of the complaint is fairly construed it means that the tax, lien and seizure were valid. We also think that when Johnston admitted the verity of Paragraph V he conceded the validity of Marshall's unpaid tax, together with the validity of the lien and the seizure.

The course taken at the trial confirms the beliefs just expressed. During the trial the tax and the lien were not contested. To the contrary, it was taken for granted that both were valid and that the tractor was subject to sale. During the reception of the evidence reference was occasionally made to the tax and the lien, not for the purpose of questioning the validity of either, but as incidental to the development of some other fact. Johnston insisted throughout the trial that Marshall had told him before he (Johnston) bought the

tractor that the plaintiff's interest in it was no more than $4,100 and that the tractor was in good mechanical condition. In giving his testimony, Johnston related some conversations concerning a proposed logging venture near Vernonia which he had with Marshall and the plaintiff before he made his purchase. Since it was planned to use the tractor in the proposed venture, the tax and the lien upon it received mention during the conversations. Nothing was said during those conversations which questioned the validity of the tax and the lien. A preceding paragraph of this opinion quotes an answer made by Johnston which detailed an offer which he made to the Collector to pay $2,200 of the delinquent tax provided the Collector would release from the lien which encumbered all of Marshall's equipment a donkey engine which Johnston desired to acquire. Of course, by making the offer, Johnston recognized the validity of the tax and of the lien. Upon another occasion Johnston and a friend of his by the name of Wonderly were negotiating with Marshall for the purchase of the tractor. Upon that occasion the following, as related by Johnston, occurred:

"Mr. Wonderly and I, if we accepted the proposition as partners, that we pay some liens that were against the donkey by the Internal Revenue and also the amount that was owing the Industrial Accident Commission against the donkey and the total price we figured would have been around ten thousand dollars on the tractor and the donkey. We were to pay these liens, which we checked, the amount of the liens approximately. We didn't get them exactly but we did go to Eugene, I believe, where the Internal Revenue lien originated, and * * * ."

The plan that was in mind at that time evidently contemplated the discharge of all the tax liens. Thus, again, Johnston acknowledged as valid the tax and its lien. The validity of the lien was recognized by Johnston in still another way. After the Collector of Internal Revenue had taken the tractor into his possession preliminary to offering it for sale, Johnston desired to resume temporary possession of it and presently applied to the Collector for permission to do so. Thereby he, of course, deemed as lawful the Collector's seizure of the tractor and of the lien upon which it was based. Johnston's exact words were:

"Q. Did you take the tractor from the custody of the Collector of Internal Revenue?

"A. I had permission from the Salem office to move that tractor."

It will be recalled that Johnston mentioned a visit which he made to the Eugene office of the Bureau of Internal Revenue for the purpose of investigating Marshall's unpaid tax. Upon another occasion he and the plaintiff visited the Portland office of the Bureau for the same purpose. It also appears that the two men obtained advice from attorneys concerning the validity of the Government's lien upon the tractor. Their visits to the local offices of the Bureau of Internal Revenue and the advice which the attorneys gave them evidently convinced Johnston and the plaintiff that the tax lien upon the tractor was incontestable. At any rate, it was not challenged at the trial. The transcript of evidence contains several more references to the tax and the seizure of the tractor. No witness, in mentioning the seizure, did so for the purpose of questioning its regularity, but only as incidental to the delineation of a transaction which was then under con-

sideration. For example, while Marshall was under cross-examination, he testified as follows:

"Q. You had talked to Mr. Johnston on three different occasions trying to get him to purchase this tractor, didn't you?

"A. Well, no. Johnston, he was going to pay this Internal Revenue off, and we was going in partners, but he. * * *.

"* * *

"Q. I see—and then in respect to the Johnston deal, was Mr. Stotts to get some money out of that to pay on his claim against the tractor, money that would come from the Johnston deal?

"A. Well, I just don't remember how that was either now. * * * Johnston was going to pay the Internal Revenue, and he found the timber, and the Vancouver Plywood paid for it for us, and I was to be a partner, and I just wasn't I guess; and then when Roy wanted to fade out of the picture and wanted his money, why, I talked to Johnston and he was going to try to get Roy his money, but Johnston at that time was dickering around with the Internal Revenue, and he was going to pay the donkey off, and get me out of hock, see, and then we were going in partners."

Other references to the tax and to the seizure of the tractor were in similar vein. All of them recognized the validity of the tax and the lien.

A careful reading of the transcript of evidence satisfies us that the tax and the lien were not contested during the trial. The trial judge and counsel, without expressly so stating, took it for granted that the pleadings presented no issue concerning their validity. It seems apparent that the answer was construed as we have construed it; that is, as an admission that everything that was essential to the validity of the tax lien,

including its filing in the right county, had been properly performed.

■ An axiom of appellate practice, familiar to all, which is sometimes called the Rule of the Theory of the Case, restricts the parties on appeal to the theory of the facts and the issues employed in the trial court. The rule prevents the appellant and the respondent alike from reaching out upon appeal for views concerning the facts and the issues which are inconsistent with or different from those which the party took in the trial court. The rule recognizes that an appellate court is a court of review and thus the operation of the rule restricts the scope of review. A recent statement of the rule, accompanied with citations, is *Edwards, Guardian, v. Hoevet,* 185 Or. 284, 200 P. 2d 955.

■ Plainly, the contention that the tax lien is invalid is inconsistent with the position taken by appellant Johnston in the trial court. In that court Johnston, far from asking for a determination of the validity of the lien, conceded its validity. The concession was made in a twofold manner: (1) by the answer; (2) by the course pursued during the trial.

For the reasons above stated, we dismiss the first assignment of error as lacking merit.

The second assignment of error reads:

"The court erred in finding that plaintiff (respondent) and defendant Earl L. Marshall were not in a joint venture in owning and operating the D-8 tractor."

If the relationship between the plaintiff and Marshall was not that of creditor and debtor, but that of joint venturers, the plaintiff was not entitled to a decree of foreclosure. Likewise, if the relationship between

those two men was that of joint venturers, it may be that the representations concerning the tractor's condition, which Johnston claims Marshall made to him and which he says were false, are chargeable to the plaintiff as well as to Marshall.

Johnston bases his contention that the relationship between the plaintiff and Marshall was that of co-venturers, principally upon the following: (1) the document which Marshall delivered to the plaintiff after the latter had paid Heider $5,820 was, in form, a bill of sale and not a chattel mortgage; (2) no note or interest-bearing paper accompanied the bill of sale; (3) when the plaintiff discharged Marshall's debt to Heider, Marshall, who was about to engage in a land-clearing undertaking in which he expected to use the tractor, promised, according to the plaintiff, "to pay me half of what he got above the expense of that particular job"; (4) Marshall impressed the plaintiff as being "a worthy youngster, * * * a hard worker," and the plaintiff thought that when a young man of that kind is helped "oftentimes those things lead into a lucrative deal * * * and it might eventually grow into something"; (5) Marshall, as a witness, expressed the belief that he was bound "to split with him [plaintiff] a certain amount, you know" of the moneys he expected to receive from the contemplated land-clearing contract after he had paid to the plaintiff $6,000; (6) Marshall, in talking with Johnston, often termed the plaintiff "his partner"; and (7) a witness (Wonderly) for Johnston testified: "He [Marshall] didn't mention Mr. Stotts' name, but he said that he owed his partner $4,000, that he would have to have that in cash, and the liens would have to be paid off in cash."

■ A bill of sale, absolute upon its face, may be shown to be a chattel mortgage: *Barber v. Motor Investment Co.*, 136 Or. 361, 298 P. 216.

The plaintiff, who is engaged, in part, in the vocation of adjusting insurance claims, is evidently a man of substance who seeks investments for his ready cash. He became acquainted with Marshall several months before he paid, at Marshall's request, Heider's note. Their meeting occurred when Marshall presented to an insurance company a claim for damage suffered by the tractor through its inundation by flood water and the claim was referred to the plaintiff for adjustment. During the negotiations which then occurred, Marshall made the favorable impression upon the plaintiff noted in a preceding paragraph. Later, when Heider made his demand for payment of Marshall's note, Marshall sought out his newly-won friend, the plaintiff, and asked him for assistance. Since the plaintiff entertained a favorable opinion of Marshall and thought that the tractor was worth much more than $5,820, he paid Heider's note.

The plaintiff and Marshall both swore that when the former paid Heider's note it was not contemplated that the two should become partners or co-venturers. The plaintiff, while under examination by counsel for Johnston, testified as follows:

"A. It was my understanding that I was to be substituted in the place of Mr. Heider.

"* * *

"Q. And you yourself was to be substituted as a sort of a mortgagee in a security relationship there for the money you actually put into it?

"A. That is right.

"* * *

"Q. Now, Mr. Stotts, when you advanced all this money, wasn't there some mention of a note, you taking a note to evidence the amount of the indebtedness which Mr. Marshall owed you?

"A. Well, as I told you in the beginning I told Klepper [an attorney] to substitute me in the place of Otto Heider, and that's what he came back with.

"Q. And you accepted it without more? I mean you never did get a note and didn't ask for one?

"A. No, I didn't. To tell the truth, I went to Honolulu immediately after, and I never examined this until several weeks after, when Mr. Johnston had failed to pay me the amount he was supposed to pay me.

"* * *

"A. You understand that Mr. Klepper and Marshall went to Salem and consummated the deal, and it was two or three nights after that that we met in Klepper's office, and he says, 'Here are your tractor papers.' And I was darned fool enough to stick them in my pocket without looking at them."

We are aware of no reason for doubting the truthfulness of any of that testimony.

Although the amount which the plaintiff paid to Heider was only $5,820, it was agreed between the plaintiff and Marshall when the payment was made that the total indebtedness should be deemed $6,000. The difference between the two sums represented the value of the plaintiff's services to Marshall in adjusting the latter's difficulties with Heider. That phase of the controversy is not questioned, and Johnston makes no contention that usury is present in the transaction.

The possession of the tractor was not changed when the plaintiff received the bill of sale, and the plaintiff never had its possession at any time.

When the plaintiff paid Heider $5,820, Marshall expected shortly to enter upon a land-clearing job, and agreed to pay the plaintiff one-half of the sums derived from it, less the cost of operation, until the full sum of $6,000 was paid. It was in that manner that the parties expected that the debt would be retired. Marshall, however, did not enter upon the land-clearing undertaking, and that source of payment failed of fruition.

In determining whether or not the plaintiff's advancement to Heider of $5,820 created a creditor-debtor relationship or one of joint venturers, we think that we ought to take into consideration the fact that the plaintiff believed that repayment to him was well secured. He deemed the tractor worth much more than $6,000 and anticipated that, since Marshall had promised to apply upon the debt one-half of the proceeds, less expenses, of the land-clearing job, his money would be soon repaid to him. Calculations of that kind accompany the formation of creditor-debtor relations, but, generally, are alien to the negotiation of partnerships.

Although we do not believe that the plaintiff and Marshall desired to be co-owners of the tractor, we think that both looked forward to an occasion when they could join together in a logging venture. The circumstances of the two men adapted them to each other. The plaintiff had money which he was willing to risk in an enterprise if it appeared promising, and he was hopeful that Marshall would discover one of that kind. Marshall, who was debt-ridden, was a logger by vocation and had equipment suitable for that business. In addition to his tractor, he had a donkey engine, logging trucks and incidental apparatus. All of it was

standing idle. Since he was in need of financial assistance, a venturesome friend with ready money like the plaintiff could enable him to use his equipment to advantage. We think that when the two men became acquainted, each viewed the other as a complement to himself.

Evidently Marshall, in referring to the plaintiff, occasionally used the word "partner", but there is no evidence that the plaintiff was aware of that fact. The word "partner" is not always used in its legal import, but is frequently employed, especially by laymen, to denote association together in matters of a nonbusiness character. Johnston, who was well acquainted with Marshall's financial condition, his prospects and property, did not testify that he believed that the plaintiff and Marshall were partners. It is most unlikely that he could have been misled when Marshall dubbed the plaintiff as his partner. Especially is that true when we bear in mind that Johnston and his friend Wonderly testified that Marshall told them that he owed "his partner" $4,000 or $4,100 on account of the plaintiff's interest in the tractor. Normally, men who are, in fact, partners do not become indebted to one another in such a manner.

Shortly after thoughts of the land-clearing contract were abandoned, Marshall and Johnston invited the plaintiff to join them in logging a tract of land near Vernonia. Their proposal contemplated that the three should become partners and that the plaintiff's function should be to finance the undertaking, maintain the records and sell the logs. The plaintiff, accompanied by an engineer, went to the tract where he was joined by Johnston and Marshall. The plaintiff, Johnston and the engineer spent a day together walking through the

timber which it was proposed to log. Later, the plaintiff conferred with officials of a concern to which Johnston and Marshall proposed to sell the logs. Still later, in the presence of Marshall and Johnston, he made a list of the equipment which they owned, suitable for logging, and also a list of the equipment which it would be necessary to purchase if the venture was undertaken. He concluded that the timber upon the Vernonia tract was insufficient in quantity to justify the expenditure of $50,000, which he estimated would have to be made for the additional equipment. Believing that the proposal made to him by Marshall and Johnston offered no prospects for profit, the plaintiff declined to enter into the undertaking. Marshall and Johnston, however, undertook the venture but were soon compelled to abandon it. After Marshall failed to enter upon the contemplated land-clearing work and, in lieu of it, joined Johnston in the Vernonia undertaking, the plaintiff asked for payment of the $6,000 item.

If Johnston ever surmised that the plaintiff and Marshall were partners, the incident which we have just described must surely have made him realize that they were not associated together in any way. The overtures which he (Johnston) and Marshall made to the plaintiff concerning the Vernonia timber ended the plaintiff's hopes that Marshall would bring forth a venture in which the two could join together for their mutual profit.

■ Without resort to further analysis, we express the belief that the plaintiff and Marshall did not become partners or co-venturers when the plaintiff paid Marshall's debt to Heider and received a bill of sale to the tractor. The bill of sale, we believe, was intended to

do no more than serve as a chattel mortgage and secure payment to the plaintiff of $6,000, together with the legal rate of interest. We are satisfied that the plaintiff's payment of Marshall's debt to Heider and the acceptance of the bill of sale created no relationship except that of secured creditor and debtor.

We dismiss the second assignment of error as without merit.

The third assignment of error follows:

"The court erred in not finding that respondent Stotts was chargeable with defendant Marshall's warranty that the said tractor was in good operating condition."

■ Since we have held that the relationship between the plaintiff and Marshall was not that of co-venturers, as appellant Johnston claims, but that of creditor and debtor, the plaintiff was not chargeable with Marshall's representations and warranties concerning the tractor.

This assignment of error is without merit.

The fourth assignment of error reads:

"The court granted appellant Johnston a judgment against defendant Marshall for $5,491.00 in its findings of fact and conclusions of law but erred in not including this recovery in the decree."

■ The defendant, Marshall, made no appearance and his default was properly entered in the record. We sustain the assignment of error.

The fifth, being the last, assignment of error states:

"The court erred in not granting an order of dismissal of Stotts' case after the entire case was submitted."

In support of that assignment of error, the appellant, Johnston, argues:

"All that Stotts had to do to protect himself was

to record the chattel mortgage. * * * The writer realizes that legally Johnson perhaps should have been put on notice of the amount of the Stotts incumbrance or at least Johnson should have inquired about the amount but that is rather a hard rule in certain cases.''

It will be recalled that the bill of sale which Johnston received from Marshall said: ''Free from all encumbrances except a note held by Roy Stoots.'' The word ''Stoots'' was erroneously written when ''Stotts'' was intended. Johnston freely concedes that he read that provision of his bill of sale before he accepted the latter. For example, he testified:

''A. You mean, did I see it?

''Q. Yes. 'And I hereby covenant with the said party of the second part that I am the lawful owner of said goods, except a note held by Roy Stotts.'

''A. That was in there. Marshall had that made in there.

''Q. You understood at that time that there was some outstanding lien or claim on this property to Roy Stotts?

''A. Yes, I understood that even over at Buena Vista when I talked to Mr. Marshall with Mr. Wonderly and myself there together.

''Q. So you were well acquainted when you took it that there was a claim in it?

''A. I did know that he owed Mr. Stotts. That is what he told me when he gave me the bill of sale a day or so later, and he said 'I will tell Mr. Roy Stotts that I have made the arrangements, and you can just pay him direct.'

''Q. Now, in other words, you knew he had some claim on it?

''A. Marshall told me from the start about that; that's right.''

It will be observed from the foregoing that Johnston knew when he purchased the tractor that Marshall was indebted to the plaintiff. He claims that Marshall represented the amount as being $4,000, but "you may have to pay $4,100." Johnston knew, so he himself conceded, that Marshall's title to the tractor was encumbered. For example, he testified:

"So I asked Marshall what kind of a deal he wanted to work out and he told me again what he would do, and when he got down to figures he said, 'Well, I want $2,000 for my equity' and he said, 'You know I owe Mr. Stotts $4,000.' * * *."

The word "equity", together with the words "lien" and "claim", which were frequently used during the purchase negotiations, show that Johnston knew that Marshall's title was encumbered.

When Johnston purchased the tractor he paid Marshall $750 cash and gave him his promissory note for $1,200. He admitted that the cash and the note did not represent the full purchase price of the tractor. The balance was payable to the plaintiff. Johnston testified:

"Mr. Marshall told me he would make those arrangements whereby I could pay Mr. Stotts, and if I didn't feel like I wanted to pay him in cash, he even went so far as to tell me that Mr. Stotts had assured him that it could be handled in a convenient way for me.

"Q. At the time when you gave Mr. Marshall the check for $750 and this promissory note for $1,200, and received this bill of sale, you knew that Stotts had something on the tractor?

"A. Why, sure."

We do not understand that the assignment of error under consideration is based upon a contention that Johnston need pay no more for the tractor than

$1,950, but that it submits that, since Marshall represented (so Johnston claims) his indebtedness to the plaintiff as being no more than $4,100, the plaintiff's lien upon the tractor is limited to that amount.

Johnston admitted that he was in the office of the plaintiff "two or three times" and had talked to him "considerably on the phone" before he bought the tractor. In addition to Johnston's "two or three" visits to the plaintiff's office, which were made before he bought the tractor, he spent an entire day with the plaintiff when the two men, together with an engineer, walked over the timbered area near Vernonia which it was proposed to log. That occurred before the tractor was purchased. Johnston claims that he did not inquire of the plaintiff at any of those times concerning the amount of Marshall's interest in the tractor, although he concedes that prior to all of those occasions Marshall told him more than once that the plaintiff had an interest or investment in the tractor.

The plaintiff's uncontradicted testimony shows that when Johnston and Marshall were in his office seeking to interest him in the proposed Vernonia logging agreement, he made a list of the equipment which the two men owned and set opposite each item the investment which each had in it. He also compiled a list of the equipment which would have to be purchased to render the project feasible. According to the plaintiff's uncontradicted testimony of which we are now taking notice, there reposed upon his desk his bill of sale to the tractor, and he referred to it while he was making his calculations. The plaintiff swore that at that time, as well as upon other occasions, he told Johnston that the amount of Marshall's indebtedness to him was $6,000.

■ We are well satisfied that Johnston knew long before he purchased the tractor that Marshall owed the plaintiff $6,000, and that the bill of sale delivered to the plaintiff by Marshall was intended as a chattel mortgage to secure payment of that debt. Johnston was as familiar with the debt and the nature of the bill of sale as if the latter had been recorded. He was neither deceived nor misled by anything which the plaintiff had done or had failed to do. The plaintiff dealt with him honorably.

In our opinion, this assignment of error possesses no merit.

The foregoing disposes of all assignments of error.

Obedient to our disposition of the fourth assignment of error, the Circuit Court will grant judgment in favor of Johnston against Marshall. Otherwise the attacked decree is affirmed.

### ON PETITION FOR REHEARING

*Boyd, Ferris & Erwin,* of Portland, for the petition.

*Wheelock & Hathaway* and *C. R. Richardson,* all of Portland, contra.

Before BRAND, Chief Justice, and HAY, ROSSMAN and LATOURETTE, Justices.

PETITION DENIED.

ROSSMAN, J.

The defendant-appellant (Johnston) has filed a petition for a rehearing which, as stated in a brief accompanyin gthe petition, "assigns as error the failure of this court to consider and determine the following issues:

"1. That where the chattel mortgagee consents to the sale of the mortgaged property by the

mortgagor that such mortgage is invalid as to subsequent purchasers.

"2. That where the chattel mortgagee consents to the sale of the mortgaged property by the mortgagor, that the lien of the mortgage is waived thereby as to subsequent purchasers either with or without notice and irrespective of the validity of such mortgage.

"3. That where a chattel mortgagor sells the mortgaged property as agent for the mortgagee, the mortgagee is bound by the representations and warranties of the mortgagor in connection therewith."

Those contentions were not made the subject matter of any assignment of error.

Section 68-207, O.C.L.A., provides:

"Every mortgage, * * * conveyance or instrument of writing intended to operate as a mortgage of personal property * * * , hereafter made, which shall not be or shall not have been accompanied with immediate delivery and followed by the actual and continual change of possession of the personal property mortgaged, or which shall not be or shall not have been recorded or filed as provided in section 68-203, shall be void as against subsequent purchasers and mortgagees in good faith and for a valuable consideration, of the same personal property or any portion thereof; * * *."

A brief submitted in support of the petition, after referring to that statute, says:

"Since the opinion of this court is that Johnston (purchaser) had actual knowledge and has also held that the bill of sale was in fact a chattel mortgage, it must now be assumed then that under our statute Johnston came within the third exception in the statute and that the mortgage was valid as to him insofar as actual notice is concerned."

We deem commendable the frankness of counsel for the petitioner (Johnston). Going on, the brief says:

"However, our statute sets forth not when a chattel mortgage is 'valid' but when it is 'void' and makes no mention of the validity of the mortgage where a mortgagee voluntarily permits or directs the sale of the mortgaged property.

"Our statute was designed merely to substitute 'recording' or 'actual notice' for the common law requirement of 'possession' and hence is not determinative of the question of validity where the mortgagee consents to the sale.

"The statute does not say a chattel mortgage is valid as to purchasers with notice, but says a chattel mortgage is void unless such notice is had by the purchaser.

"A voluntary act on the part of the mortgagee therefore in consenting to the sale may render the mortgage void as to creditors or subsequent purchasers.

"In the present case, it is conceded that the mortgage is valid as to the parties thereto and as to purchasers with knowledge until the sale with consent of the mortgagee."

Thus, it is seen that counsel for Johnston argue that a sale of mortgaged personal property, made with the consent of the mortgagee, renders the mortgage void. They, however, limit that broad contention by stating:

"This court has had this matter under consideration as between the parties and has held that the mortgage was valid as between the parties where the express direction was to pay the money to the mortgagee, but contrary where no such direction was given.

"Orton vs. Orton, 7 Ore. 478;
"Jacobs vs. Erwin, 9 Ore. 52;
"Currie vs. Bowman, 25 Ore. 364;
"Sabin vs. Wilkins, 31 Ore. 450;

"Kenney vs. Hurlburt, 88 Ore. 688;
"Teshner vs. Roome, 106 Ore. 382, 399.''

A more recent decision by this court, which employed the principle set forth in the last quotation, is *First National Bank of Burns v. Frazier,* 143 Or. 662, 19 P. 2d 1091, 22 P. 2d 325. From it we quote:

"In Sabin v. Wilkins, 31 Or. 450 (48 P. 425, 37 L.R.A. 465), after discussion of several preceding decisions of this court on this subject, it is said:

" 'In a later case (Currie v. Bowman, 25 Or. 364 [44 Am. & Eng. Corp. Cases 662], 35 Pac. 848), it was held that a chattel mortgage is valid which by its terms permits the mortgagor to retain possession with power to sell, but which required him to account to the mortgagee for the proceeds less expenses of sale. These cases indicate very fairly the policy and trend of the law in this state in so far as it is involved by the facts before us.'

"The court then states that the purpose of the parties in giving and receiving the mortgage is a test of its validity at its inception, but that the same is subject to modification, either express or implied; that it is a prerequisite to its continuing validity that good faith and fair dealing be maintained toward those whose interests are affected by it; * * *.''

Since the brief which accompanies the petition for a rehearing refers to the bill of sale possessed by the plaintiff as a chattel mortgage, so shall we. As held in our previous opinion, the bill of sale was, in legal contemplation, a chattel mortgage.

As nearly as we can ascertain from the record, Johnston did not claim during the trial that the chattel mortgage was void and that a power of sale possessed by a chattel mortgagee to sell the mortgaged item renders the mortgage void. The original brief filed

upon appeal made no contentions of that kind. After the brief was filed, Johnston's present counsel were retained, and that circumstance, possibly, accounts for the tardy voicing of the above-quoted contentions. The latter appear to be within the general issues developed by the pleadings, although it seems likely that the draftsman of Johnston's answer did not have them in mind when he wrote the answer.

When the chattel mortgage was delivered to the plaintiff neither he nor Marshall anticipated a sale of the tractor. Both thought that Marshall would continue, as in the past, to use the tractor himself. Since neither of them looked forward to a sale of the tractor, they, of course, made no provision for the disposition of the proceeds of a sale, if a sale should ever occur. It is clear that the plaintiff, when he accepted the chattel mortgage, conferred upon Marshall no power to sell the tractor.

Notwithstanding the fact that Marshall's prospects looked bright when he obtained his loan from the plaintiff, his fortunes shortly took an unfavorable turn and before long he faced the necessity of converting some of his logging equipment into money.

Although the evidence is not extensive which indicates whether or not the plaintiff authorized Marshall, after the latter's financial difficulties became acute, to sell the tractor, it warrants a belief that no such authority was given—at least, none was expressly given. The unsatisfactory condition of the evidence upon that phase of the contentions possibly is due to the fact that counsel who represented Johnston at the trial apparently did not have in mind the contentions made in the petition for a rehearing. Since the defendant-appellant, Johnston, has the burden of proof upon

his claim of invalidity, he is the one who must suffer from the unsatisfactory condition of the record, if that condition is material. The plaintiff was aware of Marshall's financial plight and evidently knew that he would have to turn some item of property into cash, but no witness testified that he empowered Marshall to sell the tractor. It affirmatively appears that he disapproved a sale of the tractor to Johnston when the subject was broached. The record does not mention any other prospective buyer for the tractor, and it clearly does not warrant a finding that the plaintiff conferred upon Marshall a general power of sale. It is true that eventually Marshall sold the tractor to Johnston, but the sale occurred when the plaintiff was absent from the state and was not aware of the negotiations. We believe that the plaintiff never authorized Marshall to sell the tractor.

It will be recalled that the brief submitted in support of the petition for a rehearing cites several decisions of this court which held that "the mortgage was valid as between the parties where the express direction was to pay the money to the mortgagee." By the term "the money", counsel mean the proceeds of the sale. We shall now ascertain whether such a direction was given when Marshall sold the tractor to Johnston.

When Johnston purchased the tractor, he paid Marshall $750 cash and gave him his promissory note in the sum of $1,200. He agreed to pay directly to Marshall nothing more than the total of those two amounts. No one contends that Johnston purchased the tractor at a price of only $1,950. The price set by the Office of Price Administration upon equipment of that kind was about $8,500. Marshall swore that he

and Johnston agreed upon a purchase price of $8,000, made up as follows: $6,000 for the discharge of the mortgage held by the plaintiff, and $2,000 for himself (Marshall). Marshall also testified that, in order to induce Johnston to make the cash payment of $750, he reduced the amount of $2,000, which was payable to him, to $1,950. In that manner he obtained at the time of the sale $750 cash and Johnston's note in the denomination of $1,200.

Johnston conceded that Marshall reduced the purchase price $50 in order to induce him (Johnston) to pay $750 cash, but swore that the price at which he purchased the tractor was $6,000. According to him, Marshall represented his indebtedness to the plaintiff as being $4,000, and thus the purported price of $6,000 was made up of the $4,000 as the debt due the plaintiff and $2,000 for Marshall. We are well satisfied, as stated in our original opinion, that Marshall's debt to the plaintiff was, in truth, $6,000, not $4,000.

Our analysis of the evidence convinces us now, as it did when we wrote our original opinion, that Johnston promised Marshall that he would pay Marshall's debt directly to the plaintiff as a part of the purchase price of the tractor. We will now review some items of evidence which have brought us to that conviction.

By reverting to our original opinion, testimony given by Johnston will be found quoted in which he stated that before he purchased the tractor Marshall told him, "I will tell Mr. Roy Stotts that I have made the arrangements, and you can just pay him direct." We also copied other testimony given by Johnston, as follows:

"Mr. Marshall told me he would make those arrangements whereby I could pay Mr. Stotts, and

> if I didn't feel like I wanted to pay him in cash, he even went so far as to tell me that Mr. Stotts had assured him that it could be handled in a convenient way for me."

He also testified:

> "That is what he told me when he gave me the bill of sale a day or so later, and he said, 'I will tell Mr. Roy Stotts that I have made the arrangements, and you can just pay him direct.'"

In still another part of his description of the transaction he swore that he "made arrangements with the bank to take care of Mr. Stotts' claim as Mr. Marshall gave it to me" and that after making those arrangements he "went over to Mr. Stotts' office to talk to him about it." The following is also taken from his account of the transaction:

> "I went to Mr. Stotts' office and told him that if he wanted to get his money right away, why, he could go to the bank at any time; I had arrangements made to pay it."

The bill of sale which Marshall delivered to Johnston, it will be recalled, said, "free from all incumbrances except a note held by Roy Stoots." The name "Stoots" was written inadvertently for that of the plaintiff, Stotts. Less than two months after his purchase of the tractor, Johnston wrote to the plaintiff as follows:

> "I am leaving town so early this morning I didn't want to phone you. If you want the money due on the tractor before I return, phone my wife and she will make arrangements to have the Bank pay you."

This, therefore, is clearly an instance in which Johnston purchased the tractor subject to the outstanding "note", that is, to the plaintiff's chattel mortgage, and agreed, as a part of the consideration,

to pay to the plaintiff the amount of Marshall's debt to him.

▮ A parole agreement by a grantee to pay a mortgage which encumbers the purchased property is valid and enforceable in equity: *Bank of Falls City v. Pugh*, 125 Or. 135, 266 P. 233, and 59 C.J.S., Mortgages, § 412, at page 589.

The evidence indicates that the plaintiff was not apprised of the transaction between Marshall and Johnston until some days after it had been completed. He then wrote to Johnston:

> "Earl [Marshall] recently told me that you were taking it [the tractor] over and that Vancouver Plywood would retire the mortgage, but Chas. Hovey advised me yesterday that was not the case. I must insist that the mortgage be retired at once or I must set about disposing of it."

▮ It is manifest that no unfair advantage was taken by the plaintiff of Johnston when the latter purchased the tractor. In fact, the plaintiff did not participate in that transaction except to disapprove of it when Marshall broached the subject. Johnston knew of the chattel mortgage possessed by the plaintiff and, as we have seen, promised, as a part of the consideration for the tractor, to pay that debt. This, therefore, is an instance in which to paraphrase counsel's language, an "express direction was given to pay the money to the mortgagee." We think that the cases cited by counsel demand a holding that the plaintiff's chattel mortgage was valid.

The foregoing disposes of the first contention submitted by the petition for a rehearing.

We believe that the second and the third contentions submitted by the petition for a rehearing are answered

by the portrayal of the facts set forth in preceding paragraphs. The plaintiff did not authorize a sale of the mortgaged property; at least, he did not authorize a sale to Johnston. The plaintiff never made Marshall his agent for the sale of the tractor, and Johnston never assumed that Marshall was the plaintiff's agent.

The petition for a rehearing is denied.