Argued December 7, 1948; affirmed March 8, 1949

# BUTCHER et al. v. FLAGG, AS PUBLIC UTILITIES COMMISSIONER, and O. W. R. & N. CO., and U. P. R. CO., intervenors-respondents

203 P. (2d) 651

*J. S. Middleton,* of Portland, argued the cause and filed a brief for appellants.

*E. L. Graham,* Assistant Attorney General, argued the cause for respondent Public Utilities Commissioner. With him on the brief was George Neuner, Attorney General, both of Salem.

*F. J. Betz* argued the cause for intervenors-respondents. With him on the brief were Roy F. Shields and Randall B. Kester, all of Portland.

Before ROSSMAN, Chief Justice, BELT, BAILEY and BRAND, Justices.

BAILEY, J.

This proceeding was brought in the Circuit Court of the State of Oregon for Multnomah County under the "Uniform Practice Act of the Public Utilities Commissioner" (§§ 112-4,111 to 112-4,122, O. C. L. A.), by Isaac Butcher, Frank W. Hill, and Troutdale Farms, Inc., an Oregon corporation, against the Public Utilities Commissioner of the State of Oregon to review the Commissioner's order denying their application for authority to construct a public highway at grade across the right of way and main line track of the Oregon-Washington Railroad & Navigation Company, which right of way and track are leased to and used by the Union Pacific Railroad Company. The two mentioned railroads asked, and were granted, permission to intervene. From a decree sustaining the Commissioner's order plaintiffs have appealed.

The plaintiffs, in this proceeding, and Multnomah County filed with the Commissioner their application, pursuant to § 113-502, O. C. L. A., to secure his permission to construct a highway across the above mentioned track. A short time after filing such application, Multnomah County notified the Commissioner that it had "joined in the petition for the construction of

approaches for a grade crossing over and across the Union Pacific Railroad Company * * * for the sole purpose of accommodation to the other petitioners," and "that the county has no direct interest in said crossing further than the accommodation of citizens of the county of Multnomah", and that therefore it "waives its right to appear at said hearing and agrees to abide by any disposition made of said petition by" the Commissioner. Multnomah County did not participate in the hearing before the Commissioner and is not a party to this proceeding.

Section 113-502, *supra,* was enacted in 1917. (Laws, 1917, ch. 228, § 2.) The word "commission" therein used means the public service commission. § 113-501, O. C. L. A. In 1931 the office of public utilities commissioner was created and the duties imposed upon the public service commission were transferred to the public utilities commissioner. Oregon Laws 1931, ch. 103. We now quote that section with the word "commissioner" in brackets inserted after the word "commission":

"No highway shall hereafter be constructed across the track of any railroad company at grade, nor shall the track of any railroad company be constructed across a highway at grade, without having first secured the permission of the commission [commissioner]; provided, that the foregoing shall not apply to the replacement of lawfully existing roads, highways and tracks. The commission [commissioner] shall, after a hearing, have the right to refuse its permission or to grant it, upon such terms and conditions as it may prescribe. The commission [commissioner] shall have power, after a hearing, to determine and prescribe the manner, maintenance, use and protection of each such grade crossing, and may prescribe the place of crossing; provided, however, the commission [commissioner]

may, in its discretion, upon good cause appearing therefor, and upon such conditions as it may prescribe, be ex parte order, and without the hearing provided for herein, authorize the establishment of side tracks or industrial spurs across existing highways.''

■ This section relates to public crossings (see § 113-501) and not to private ones, which are governed by § 113-302, O. C. L. A. It refers to the construction and not to the laying out of a highway across the track of a railroad at grade. It matters not when a highway was legally established if it was not physically existent when § 113-502 was enacted. Before it can be constructed across a railroad track at grade permission to do so must be secured from the commissioner. *Paterson and Ramapo R. R. Co. v. Paterson,* 81 N. J. Eq. 124, 86 A. 68; *N. Y. and N. E. R. Co. v. City of Waterbury,* 55 Conn. 19, 10 A. 162.

■ By § 113-502 authority is conferred upon the commissioner to determine whether permission shall be granted to construct a highway across the track of a railroad company at grade. Determination of this matter is a legislative or an administrative question. *Warren v. Bean,* 167 Or. 116, 125, 115 P. (2d) 167; *Pacific Tel. & Tel. Company v. Wallace,* 158 Or. 210, 220, 75 P. (2d) 942; *Pierce Auto Freight Lines, Inc., v. Flagg,* 177 Or. 1, 38, 159 P. (2d) 162. In *Warren v. Bean* this court quoted with approval the following excerpt from *St. Joseph Stock Yards Co. v. United States,* 298 U. S. 38, 51, 56 S. Ct. 720, 80 L. Ed. 1033:

"* * * The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. [Citing authorities.] When the legislature itself acts within the broad field of legis-

lative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. [Citing authorities.] In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.''

Section 112-4,119, *supra,* permits any party aggrieved ''by any findings of fact, conclusions of law, or order, including the dismissal of any complaint or application, made by said commissioner,'' to prosecute a suit or proceeding against the commissioner ''to modify, vacate or set aside such findings of fact, conclusions of law or order.'' Section 112-4,121 provides: ''If, upon the trial of a suit, evidence shall be introduced which is found by the court to be different from that offered upon the hearing before the commissioner or additional thereto, the court, before proceeding to render judgment, unless the parties to such suit stipulate in writing to the contrary, shall transmit a copy of such evidence to the commissioner and shall stay further proceedings in said suit for 15 days from the date of such transmission.   *   *   *''

At the conclusion of the introduction of evidence in the Circuit Court the parties to this proceeding entered into the following stipulation: ''It is stipulated by and between the Plaintiffs, Defendant, and Defendant[s] in Intervention that the evidence introduced in the above entitled court and cause shall not be

referred to the Public Utilities Commissioner of Oregon as provided in Section 112-4,121, and that said suit shall be determined by the court upon the law and facts of record."

There should be read in connection with the foregoing sections the following sentence of § 112-458, O. C. L. A.: "In all trials, actions, suits and proceedings arising under the provisions of this act or growing out of the exercise of the authority and powers granted herein to the commission [commissioner], the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful, as the case may be."

In *Warren v. Bean,* supra, at page 125, the court, in commenting upon the burden cast upon a litigant attacking an order of the commissioner, said:

"* * * Hence, a would-be carrier, seeking to set aside an order of the public utilities commissioner refusing to grant him a permit, must show by clear and satisfactory evidence that the order of the commissioner was not supported by substantial evidence or that, for some other reason, it is unlawful, unreasonable or unjustly discriminatory and, if he fails to make such a showing, the order must stand and is conclusive upon the courts. See Oregon-Washington R. & N. Co. v. Corey, 120 Or. 517, 524, 252 P. 955, and authorities there cited."

■ The fact that the parties to this litigation stipulated that the evidence which was introduced in the Circuit Court should not be referred to the Commissioner "as provided in Section 112-4,121, and that said

suit shall be determined by the court upon the law and facts of record" does not relieve the plaintiffs of the burden imposed upon them by § 112-458, *supra,* nor does it have the effect, as they seem to think, of transferring from the Commissioner to the Court the determination of the question whether the plaintiffs should be granted or denied permission to construct a highway across the track of the railroad company.

The proposed railroad crossing is near the west end of the Columbia Gorge, about half a mile west of Corbett Station, on the main transcontinental line of the Union Pacific Railroad Company. At the point of the proposed crossing the railroad track extends in a general easterly and westerly direction parallel with and slightly above the normal level of the Columbia River. Between the river and the railroad track the new Columbia River State Highway is being constructed. The two rights of way are contiguous. It is admitted by the litigants that it is impracticable to construct a crossing either above or below grade at or near the site of the proposed grade crossing due to the physical contour of the earth and the proximity of the Columbia River Highway to the Union Pacific railroad.

In 1941 Mr. Butcher purchased from the Corbett Investment Company a little over 16 acres of land which adjoins the railroad right of way for approximately 1800 feet. In 1946 Frank W. Hill purchased from Butcher 6.18 acres off the west end of that tract. Troutdale Farms, Inc., owns about 400 acres of land which it bought from the Corbett Investment Company in 1943. This tract of land surrounds the Hill and Butcher tracts on the east, south, and west. It is adjacent to the railroad company's right of way for a

distance of 1800 feet west of the Hill tract and about 400 feet east of the Butcher tract. Only a minor part of the land of Troutdale Farms, Inc., would be affected by the proposed crossing. The remainder of its land is reached from established roads. Butcher, Hill, and Troutdale Farms, Inc., are the plaintiffs in this proceeding.

The lands of the plaintiffs primarily involved in this litigation lie in part below and in part above the level of the Union Pacific Railroad track and are enclosed on the southerly side thereof by a high bluff which extends at its easterly and westerly ends directly to the railroad track, causing these lands, in the language of the plaintiffs, to be "enclosed, in substantially half-moon or semi-circular form, on the flat side by the railroad track, and on the rounded side by the bluff."

The railroad was built in 1881 or 1882. E. J. Taylor then owned and occupied the lands now owned by plaintiffs. In his house, which was located about 150 feet south of the present railroad track, he maintained a post office, the mail being carried to and from it by boats which docked near the site of the proposed crossing. At the time of the construction of the railroad Taylor granted to the railroad company a right of way for its track and reserved two crossings, one at grade and the other below grade. The trestle where the below grade crossing was located was shortly thereafter replaced by the railroad company with a dirt fill, thereby preventing any further use of that crossing. Prior to the construction of the railroad the occupants of the land now owned by plaintiffs and the "occupants of farms on the hillside above", quoting from plaintiffs' brief, "reached the river landing by a rough

road, steep and with hairpin turns, descending along the face of the bluff from the upper country and thence along the road used by Taylor to the river. * * * The mail was carried over it back from the river, through Taylor's post office, to another post office on the hill above. These uses had long preceded the building of the railroad, and they continued after the building of the railroad until probably along about 1905, when river traffic fell off and there were no longer boats which regularly called at the landing. * * * Later, the road up the hill fell into disuse; the crossing was removed by the railroad company; and, presently, neither road nor crossing is present as a physical and existing thing."

Evidence was introduced by the plaintiffs that it would cost approximately $15,788 to rebuild the old road up the face of the bluff suitable for automobile traffic; that it would be a one-way road with at least three turnouts, and that it would be subject to continued slides because of the unstable nature of the terrain. In order to reach the road at Corbett Station from the plaintiffs' lands it would be necessary to remove a rock bluff which is a part of a rock quarry owned by the State of Oregon. This would cost between $9,000 and $10,000, and to construct the balance of the road to plaintiffs' properties it would cost an additional $2,000.

From the old roadway where it approaches the railroad track from the south, there is at 50, 75, and 100 feet from the crossing an unobstructed view to the west of several thousands of feet; at a distance of 25 feet the view to the west is unobstructed for a distance of 2,000 feet. The view to the east, 25 feet south of the crossing, is 100 feet; at 50, 75, and 100 feet south

of the crossing the view of the track to the east is obstructed by a bluff. Plaintiffs suggest a removal of this bluff, or enough thereof to afford a view of 400 to 500 feet to the east, at an expense of between $3,000 and $3,500. It would cost from $4,200 to $4,500 to install an automatic signal at the crossing. The proposed railroad crossing is at the northwest corner of Butcher's tract of land. The record does not indicate the cost of constructing the road from plaintiffs' property across the railroad right of way to the Columbia River Highway.

Approximately 24 trains, including freight and passenger, pass over this track daily. Freight trains average from 65 to 100 cars and passenger trains have an average of 9 to 18 cars. They all travel at relatively high speeds, from 40 to 60 miles an hour. Witnesses for the intervenors testified that the proposed crossing would be extremely hazardous because of the limited view in an easterly direction, the steep grade encountered in approaching the crossing from the south, the poor audibility at the crossing of trains approaching from the east, the proximity of the relocated Columbia River Highway to the railroad track, and the climatic conditions sometimes prevalent during the winter months. Plaintiffs, on the other hand, contend that the hazard is not as great as claimed by witnesses for the railroads.

The Commissioner denied the petition of the applicants on the ground that "the hazards arising from the granting of the applicants request for a crossing at this point would endanger the safety of the public". Ten witnesses testified in the court proceeding. Seven of these had previously testified at the hearing before the Public Utilities Commissioner. One of the three

witnesses who testified before the Court, but did not testify before the Commissioner, was O. E. Sworden, who assisted Butcher in timing the speed of trains at the proposed crossing. Another such witness, Sam Swirsky, who testified for plaintiffs, told about the conditions which existed in the vicinity of Corbett 51 years ago. The other witness, David Don, who is chief engineer for the Public Utilities Commissioner, sat as an examiner in the original hearing before the Commissioner. He testified that in his opinion even with the removal of the bluff which obstructs the view to the east "the crossing would still not be safe." He also testified to the speed of the trains at the site in question.

We have referred to the fact that E. J. Taylor had granted to the railroad company a right of way for its track and had reserved two crossings, one at grade and the other below grade. The deed from Taylor to the railroad company is dated the 20th day of April, 1882, and it conveyed "A strip of land sixty feet in width, being thirty feet in width on each side of and parallel with the center line of the main track" of the railroad company. Not long after the conveyance of this right of way Taylor conveyed the lands now owned by the plaintiffs, together with other lands, to the late Henry W. Corbett. In 1907 the Oregon Railroad & Navigation Company, a corporation, instituted proceedings against the executors of the Estate of Henry W. Corbett, Deceased, and his heirs at law, to condemn a strip of land 100 feet in width over and across the premises owned by said defendants, and on July 2nd of that year judgment was entered, appropriating said strip of land to the plaintiff for railroad purposes.

It is contended by plaintiffs that the reservation

in Taylor's deed of two railroad crossings inured to the benefit of the public, thereby constituting said crossings public and not private. We do not concur in that contention. A reservation must be in favor of the grantor and cannot be in favor of a stranger to the deed. 26 C. J. S., Deeds, § 138c, p. 445; 16 Am. Jur., Deeds, § 299, p. 609; Anno., 39 A. L. R. 128. Therefore such reservation did not establish a public crossing over or under the railroad track. Whatever right to a crossing or crossings was reserved by Taylor for himself and his successors in interest appears to have been extinguished by the judgment in the condemnation proceedings hereinbefore mentioned. The strip of land appropriated to the railroad company is 100 feet in width, whereas the tract conveyed to the railroad by Taylor was only 60 feet wide. No right to cross the railroad's right of way was reserved in such judgment. How much of the right of way which Taylor conveyed to the railroad company is included in the 100-foot strip of land described in the judgment of appropriation is not disclosed by the record.

■ There was not, in 1917 when § 113-502, *supra,* was enacted, any physically existent highway across the railroad track at or near the proposed crossing and therefore, regardless of any reservation in the Taylor deed or previous use of a crossing, the proposed highway cannot now be constructed across the track of the railroad companies at grade without first securing the permission of the Commissioner. It is expressly declared in § 113-502 that that section "shall not apply to the replacement of lawfully existing roads, highways and tracks." The Commissioner has no jurisdiction in instances involving the replacement of lawfully existing roads and highways, and plaintiffs, in

seeking to secure his permission to construct a highway across the track of the railroad companies, necessarily admit that they are not concerned with the replacement of an existing highway.

The declared public policy of this and other states for many years has been averse to the construction or maintenance of highways crossing railroad tracks at grade. In *N. Y. & N. E. R. Co. v. Waterbury,* supra, decided in January, 1887, the Supreme Court of Errors of Connecticut observed:

> "The plain purpose of the act of the legislature is to make possible the coming of the day when there shall not be in this state an intersection of a highway with a railway at the same grade; to bring that day nearer by forbidding the addition of another to the many such then in existence. It means that although a highway may have been previously laid out, partially constructed, and even built upon, if it has not actually been completed for public use across the rails of the railway, such crossing shall not thereafter be made. This peremptory arrest of the completion of a highway lawfully commenced is a seeming interference with the rights of individuals and of the public, but only in seeming. *In fact such crossings are public nuisances dangerous to human life; and no man has a vested interest in the creation or continuance of such a nuisance."* (Italics supplied.)

The 61st Annual Report of the Interstate Commerce Commission, at page 126, gives the following data concerning grade crossing accidents in this country:

> "During the calendar year 1946, there were 4,001 accidents at highway grade crossings which resulted in the death of 1,851 persons and injury of 4,397 persons. Automobiles were involved in 3,518 of these accidents, in which 1,558 persons were

killed and 4,137 injured. There were 60 derailments of trains as a result of collisions between trains and automobiles, which caused the death of 28 persons and the injury of 79 persons. Of the total casualties resulting from derailments and other train accidents at highway grade crossings, 10 persons killed and 58 injured were railroad passengers, employees, and persons carried under contract."

During the year 1947 there occurred in Oregon 379 grade crossing accidents in which 14 persons were killed and 88 injured. Public Utilities Commissioner of Oregon, Statistical Report, 1947, Railroad Accidents, p. 14.

■ The order of the Commissioner denying the applicants permission to construct the proposed highway across the track of the railroad companies is supported by cogent, competent, material, and substantial evidence. This applies to the evidence introduced at the hearing before the Commissioner and also to that introduced in the trial before the Court. The evidence in the Circuit Court is to a large extent cumulative. It is not at variance with that received at the hearing before the Commissioner. In our opinion the plaintiffs have failed to "show by clear and satisfactory evidence" that the order of the Commissioner is not supported by substantial evidence, or that such order is unlawful or unreasonable, or that the Commissioner erred in the application of the rules of law to the matter under consideration.

The decree appealed from is affirmed.