Argued October 13, affirmed as modified December 31, 1954,
petition for rehearing denied January 26, 1955

# VAN NATTA *v.* NYS and ERICKSON ET AL.

278 P. 2d 163
279 P. 2d 657

*D. C. Bond,* of Portland, argued the cause for appellant. With him on the brief was George G. Van Natta, of St. Helens, attorney pro se.

*Norman B. Kobin,* of Portland, argued the cause for Respondent Nys. With him on the brief was W. J. Prendergast, Jr., of Portland.

*Leo Levenson,* of Portland, argued the cause for Respondents Erickson. On the brief were Norman B. Kobin and W. J. Prendergast, Jr., of Portland.

Before LATOURETTE, Chief Justice, and ROSSMAN, TOOZE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a decree of the circuit court which dismissed his complaint.

The subject matter of the controversy is a road of undisclosed length which lies in Columbia county and which the parties term a "CCC" road. The dispute between them centers in a part of the road which extends from the plaintiff's home on the west to a county road on the east known as the Apiary-Nehalem Valley County Road. The distance from the plaintiff's home to the county road is 2.6 miles. A fraction of the westerly part of the disputed section lies upon property which the plaintiff owns, and the easterly 75 yards is upon property which is owned by one Potter. Apart from those two short lengths, all of the rest of the 2.6 mile stretch crosses land owned by the intervenors-respondents. This suit is concerned only with the part of the 2.6 mile section which lies upon the property of the intervenors-respondents. It is about 1.6 miles long. Since the parties term the road a CCC road, we will also use that term.

The plaintiff-appellant is the owner of a tract of land in Columbia county which he devotes to reforestation and cattle grazing purposes. His predecessor in title was the county. The plaintiff contracted in 1940 to purchase the land from the county, and on July 3, 1941, received the deed. The land was a part of an area eight square miles or more in extent which was owned by the county and which completely surrounded the piece which the plaintiff purchased. When the plaintiff made his purchase he built a house upon the part which we have mentioned and has made his home there ever since.

The complaint, referring to the CCC road, alleges:

"In connection with and to the plaintiff's ownership of the premises above described the plaintiff is also the exclusive owner of a sixty foot right of way extending westerly from a point on the Apiary-Nehalem Valley County Road, near the center of Section 22, Township 6 North of Range 3 West of Willamette Meridian, being 30 feet on each side of the center line of presently traveled road, intersecting a 'CCC' road about 75 yards from said County Road and continuing on location of said CCC road to plaintiff's premises above described."

The last four words, "plaintiff's premises above described", refer to the west half of the west half of Section 21, Township 6 North of Range 3 West of the Willamette Meridian. The plaintiff's home is in that part. Actually, the "premises above described" is only a minor part of the plaintiff's land, but since the road, and not the land, is the subject matter of the controversy, the description of the other parts of the land is immaterial.

The defendant-respondent is Donald Nys, a logging contractor, who made use of the aforementioned road prior to the institution of this suit. He did so while logging upon the property of the intervenors-respondents, Walter S., Charles D. and Irving T. Erickson. The property of the Ericksons abuts upon the east the property of the plaintiff, and, like the latter's is principally useful for reforestation and cattle grazing purposes. It contains a stand of timber which Nys, under contract with the Ericksons, has been logging. The operation, which is small, employs one truck and four men. The CCC road stretches along much of the property owned by the Ericksons. For purposes of

convenience, we will speak of the plaintiff-appellant as the plaintiff, of the defendant-respondent Nys as the defendant, and of the intervenors-respondents as the Ericksons.

The complaint, as we have seen, alleged that the plaintiff is ''the exclusive owner'' of the CCC road. Other averments charged that the defendant Nys

> ''has wrongfully and unlawfully claimed and asserted in his own behalf the right to make unrestricted use of plaintiff's easement above described and he has threatened to and will, unless restrained by this Court, take heavily loaded logging trucks and other equipment over said roadway  *  *  *.''

After stating that Nys' operations, unless enjoined, ''will soon have damaged'' the road, the complaint prayed for an injunction.

The answer of Nys denied the complaint's averments with the exception that it admitted the plaintiff's ownership of the land. Further parts of the answer alleged that the defendant was logging land owned by the Ericksons and in connection therewith was using parts of the road which lie upon the Erickson's property. The Ericksons filed a complaint in intervention which alleged their ownership of the land upon which the road was situated, and averred that Nys was conducting his logging operation in their behalf. The pleading prayed for a declaration of rights. The answer to the complaint in intervention admitted that ''intervenors are entitled, as owner of the servient tenement, to make such use of any premises owned by them as does not obstruct or destroy plaintiff's easement, or render the exercise of plaintiff's right unreasonable, difficult or burdensome.''

After the parties had rested, the trial judge ren-

dered a memorandum opinion, from which we take the following:

"From an examination of the record title as disclosed by the deeds offered in evidence and above referred to it is clear that the plaintiff did not acquire any kind of an exclusive right of way by express grant from Columbia County or from anyone else. There is no language in the deeds which could be construed as granting to plaintiff an exclusive right of way.

"It is the opinion of the Court that plaintiff's right to use the road is in the nature of an easement by implication. Whether this easement by implication was created by necessity, prescription or estoppel does not appear important to the determination of this case since plaintiff's right to use the road must be governed by the law relating to the relative rights of the owners of dominant and servient estates.

"The owner of a dominant estate in an easement does not acquire an exclusive right to use the easement to the exclusion of the holder of the servient estate unless given an exclusive use by express grant.

\* \* \* \* \* \*

"Since the Court is of the opinion that the plaintiff's right to use the roadway is not exclusive the remaining question is, does defendant's use of said road in connection with his logging operation constitute such an unreasonable use or threaten such irreparable damage as would warrant a court of equity in granting injunctive relief. From a consideration of all of the evidence the Court does not believe that injunctive relief should be granted. The evidence shows that the road can be used for log truck travel without irreparable damage. Indeed, the plaintiff himself operated logging trucks over the same road during a portion of the past summer without any great amount of damage to the road. Nor does it appear that any great amount of damage resulted to the road as a result of de-

fendant's operations during the past summer and to the date of this trial. Some wear results from such use to be sure, but it can be repaired. * * *

"Summarizing the Court's view of this case, the plaintiff and the Ericksons, the Intervenors herein, and those in privity with the Intervenors, both have a right to use this road. Each in the use of the road is entitled to a reasonable enjoyment thereof."

The plaintiff presents these two assignments of error:

"The court erred in denying plaintiff's prayer for a prohibitory injuction against the defendant and intervenors."

"The court erred in denying plaintiff recovery of compensatory damages."

When the plaintiff contracted in 1940 with the county to purchase his land, it was completely land-locked, as we have said, with other tracts which the county retained. The area was intercepted by no public roadways, unless the CCC road was of that nature.

The only means in the form of a road or a trail whereby the plaintiff could gain access to and egress from the land which he had purchased was the narrow road which the witnesses termed the CCC road. It was built about 1936 by the federal agency which had its origin in the depression period and which was known as the Civilian Conservation Corps. The youths who constructed the road employed, in large part, the grade of an abandoned logging railroad. However, where the logging railroad had crossed canyons by means of trestles, the road built by the CCC did not restore the trestles but followed the contour of the land. The road was about eight or nine feet wide and was designed for fire protection. Although some parts of it had a rock base, it was principally a dirt road

and could not be traveled by vehicles in the winter months.

The deed to the plaintiff, who is a member of the bar, did not mention the CCC road, but the plaintiff swore that when he made his purchase he relied upon the road as his means of ingress and egress.

When the plaintiff built his home upon his newly acquired possession, he began to improve the road. At the outset he was forced to restore some of the surface. Presently he began to spread gravel upon sections of the road. In some of that work he was aided by the county. He has added gravel to the surface from time to time since then. Witnesses described the road as "fair." One termed it "a good country road." Its width is convenient for only one vehicle.

July 11, 1941, the Ericksons purchased by contract from the county a major part of their land. May 16, 1949, they acquired from a husband and wife, C. I. and Lillian Trimm, the remainder. We believe that we have sufficiently indicated that much of the land which the Ericksons received through their two purchases lies between the plaintiff's property and the aforementioned Apiary-Nehalem Valley county road. The latter, which is winding, pursues in the general vicinity with which we are concerned a north-south direction. Thus, the road just mentioned is about 2.6 miles east of the plaintiff's property and parallels its easterly boundary line.

The deed to the Ericksons which was delivered to them May 5, 1943, contains the following clause: "except 60 foot right of way for CCC and County roads now located on this property". On August 22, 1941, the county contracted to sell to the aforementioned C. I. Trimm the tract of land which the Ericksons later acquired from him and his wife. The deed was de-

livered to Trimm October 2, 1941. It contains the following: "except 60 foot right of way for CCC and county roads now located on this property". The deed from the Trimms to the Ericksons contains similar language. The exceptions just quoted probably refer to the CCC road.

The CCC road enters the plaintiff's property in only one place. It is the small area where the plaintiff's house and its accompanying structures stand. When the plaintiff leaves his home and enters upon the CCC road he travels easterly for 2.6 miles and thereupon has reached the Apiary-Nehalem Valley county road. When he makes the reverse trip from the Apiary-Nehalem Valley county road to his home, he has not come to the end of the CCC road. In the area where his home stands the CCC road turns south and proceeds through the land of the Ericksons for about three miles. The Ericksons also own two sections of land which lie north of the plaintiff's and which, seemingly, can be served by the part of the CCC road which the plaintiff uses.

The defendant Nys began to use the part of the road in issue in June of 1952. At that time he brought to the site of his operations his logging equipment. Thereafter he hauled out, according to the plaintiff, 104 loads of logs. The plaintiff concedes that he himself hauled out during the same interval about 12 loads of logs. In addition, the plaintiff and members of his family drive upon the road daily by automobile.

From the foregoing, we see that when the plaintiff purchased his land from the county his acquisition was completely surrounded by areas which the county retained. The part of the purchased land upon which the plaintiff constructed his home could be reached from the Apiary-Nehalem Valley road by the CCC

road. The latter was the only thoroughfare in the area. The evidence indicates there were one or two other routes by which the plaintiff could reach a public highway. However, these other routes traverse land which the plaintiff did not own and over which he possessed no easement. There are also other routes which the defendant Nys and the Ericksons could use for the operation of their logging truck, but those routes are not as suitable as the CCC road and would require construction work to make them fit for use.

The plaintiff claims that the CCC road has been substantially damaged by the use which the defendant has made of it through the operation of his logging truck.

■ It will be observed from the facts above mentioned that when the plaintiff received his deed from the county, the land described in the deed did not abut upon a public highway and that the deed did not contain a grant of an easement of way over the remaining land of the county so that he could reach the Apiary-Nehalem Valley county road. It is well settled that an owner of landlocked premises has an easement of way, through necessity, over the remaining land of his grantor so that he may reach the public highway.

"The sales by the mortgage company to Willians and Kemp of tracts of land in the west end of the Hooker donation land claim carried with them, by presumption of law, to the grantees a right of way over the unsold portion of the claim retained by the company, for without such a way the land sold would be practically useless to the grantees. It was surrounded by that of private individuals, and there was no means of reaching a public highway, except over the land of the mortgage company or by trespassing on that of a stranger; and the rule of law is that 'if one conveys to another, out of

a parcel of land, a part lying neither on the highway nor on the grantee's other land, it will be useless to the new owner, unless he can have access to it; hence, by presumption of law, the deed carries with it to the grantee a right of way over the unconveyed part. * * *' ''

*Brown v. Kemp,* 46 Or 517, 81 P 236. See also, *Rose v. Denn,* 188 Or 1, 212 P2d 1077, 213 P2d 810.

■ When the plaintiff purchased his land from the county, the CCC road did not reach the Apiary-Nehalem Valley county road but stopped 75 yards short of that thoroughfare. It is not necessary that the servient tenement abut directly upon the highway. *Cheney v. O'Brien,* 69 Cal 199, 10 P 479.

With reference to the course of a way of necessity, 2 Thompson on Real Property (Perm Ed) 130, says:

"If a convenient way has been used prior to the conveyance by the grantor, it will ordinarily be understood that the same shall be continued."

*Barnard v. Lloyd,* 85 Cal 131, 24 P 658, was an action to compel the removal of obstructions from a private right of way and to recover damages. The private right of way was in existence at the time of the grant to the plaintiff and constituted the only means of access to the granted lands. The court held that the right to use the private road passed as a way of necessity when the grant was made. In *Brown v. Kemp,* supra, the road over which it was held that the owners of the dominant tenement had an easement of way by necessity was in existence at the time of their grants. *Cullison v. Hotel Seaside,* 126 Or 18, 268 P 758, was a suit by owners of lots near a beach to enjoin the maintenance of obstructions to access to the beach. An easement of way had been granted in general terms, rather than by metes and bounds, to the lot owners

over the surrounding land when all of it was owned by the common predecessor in title. In granting the plaintiffs a decree, it was said:

"* * * it is a familiar rule that when a right of way is granted without defined limits, the practical location and use of such way by the grantee under his deed acquisced in for a long time, by the grantor, will operate to fix the location, where the intention is not fairly expressed in the terms of the grant controlling the future location: * * *."

■ In the case at bar, so far as the record indicates, the only practical means whereby the plaintiff could reach a public highway by going over the land of his grantor was through use of the CCC road. Therefore, the plaintiff has an easement by way of necessity over that route.

■■ It will be recalled that the deed to the Ericksons and the one to Trimm, as well as the one from the Trimms to the Ericksons, contain exceptions for a "60 foot right of way for CCC and County roads now located on this property". The plaintiff's brief argues:

"Both title deeds of intervenors (Ex. 8 and 11) contain the same exception, viz." 'Except 60 foot right of way for CCC and County roads now located on this property.' At that time there was a so-called 'CCC' road, but no County road, located on the property, and it is conceded that this so-called 'CCC' road is the road in dispute in this suit.

"The circumstances of the case make the meaning of the above-quoted exception clear: Since the county had, by implication, conveyed an easement to the plaintiff, the county reserved the right of way when it conveyed to Ericksons and to Trimm."

Insofar as the foregoing language asserts a claim of exclusive use for the plaintiff, it is plain that the exceptive clauses of the deeds do not purport to grant

an easement to him or even to confirm title to any easement that he may have previously acquired from Columbia county, for those clauses do not refer to him; much less do they purport to grant or confirm exclusive use of an easement to anyone. The rule which the facts of this case do not even evoke as to exceptions and reservations in favor of a stranger to a deed is stated in 6 Thompson on Real Property, (Perm Ed) § 3483, p 716, in these words:

> "Reservations in a deed are ordinarily ineffectual to create title in a third party or stranger, but may, when so intended, operate as an exception to the grant. While a clause in a deed phrased as a reservation may be treated as an exception where it is necessary to do so to carry out the parties' plain purpose, such clause, when so construed, can not vest rights to property excepted to strangers to the instrument. An exception in favor of a stranger can do no more than recognize and confirm rights which the stranger already has."

See, to like effect, 26 CJS, § 138 (at p 445) and *Butcher v. Flagg,* 185 Or 471, 203 P2d 651. Therefore, the plaintiff's suggested construction of the exceptive clauses in the intervenors' chain of title is lacking in merit.

As we have noticed, the deed to the Ericksons and the one to Trimm contain exceptions for a "60 foot right of way for CCC and County roads now located on this property". The respondents suggest that the CCC road is a county road. The evidence upon that subject is extremely scant. In the circuit court no contention was made that that road is a public thoroughfore and, hence, we will not consider the matter. *Stotts v. Johnson and Marshall,* 192 Or 403, 234 P2d 1059, 235 P2d 560.

The above analysis convinces us that the plaintiff

possesses an easement of way which has its basis in necessity, and that the course of the way is the part of the CCC road which is in dispute.

■ Although the plaintiff has an easement by necessity in the road in issue, it is our belief that he cannot use it to the exclusion of the Ericksons, who are the owners of the servient tenement. In 1 Thompson on Real Property (Perm Ed), § 329, p 525, it is said:

"A grant of the exclusive use of land is not an easement, for such a grant excludes the grantor, and is in practical effect a grant of the soil itself."

The owner of the servient tenement may also use a road in which another has an easement. In 3 Tiffany, Real Property (3rd Ed), § 811, p 355, it is stated:

"The owner of land subject to a right of way may himself use the same way, provided this does not unreasonably interfere with the exercise of the other's easement."

The following appears in 28 CJS, Easements, § 91(b), p 771:

"* * * an owner, whose land is burdened with a right of way, unless he has expressly agreed to the contrary, may use the land over which the way passes in any manner which does not materially impair or unreasonably interfere with its use as a way. Without expressly reserving the right, he may himself use the way, or permit others to do so, unless the rights of the owner of the easement are exclusive; * * *. However, the use of the servient owner must be reasonable and not such as will injure, impair, or obstruct the enjoyment of the way by the grantee or subject him to extra labor and expense in keeping it in repair; and the owner of the way may restrict such use of it by the owner of the servient tenement as is inconsistent with the enjoyment of the easement."

We assume that the passage which we quoted from CJS, particularly the part which includes these words, "subject him to extra labor or expense in keeping it in repair" means that if the use of the road by the servient tenement subjects the dominant tenement to "extra labor or expense", the dominant tenement may be entitled to reimbursement. We have examined the authorities cited by the text and do not believe that they indicate that the dominant tenement is entitled to exclude the owner of the servient tenement from the road whenever it develops that his use of it subjects the dominant tenement to extra labor or expense.

We shall now examine the evidence and ascertain from it whether the use of the CCC road by the defendant Nys in connection with the logging operations that he conducted for the Ericksons unreasonably interfered with the easement of the plaintiff. We shall consider the extent of the defendant's logging operations, the change in the condition of the road from the time the defendant commenced using it until the case was heard, and the feasibility of using the road for the transportation of logs.

The defendant Nys testified as follows in regard to the extent of his logging operations:

"Q And of what does your crew consist?
"A Myself and four men. We have one truck, two cats, two power saws—sometimes three.

"Q You mentioned two cats. What work does the cat perform?
"A They do the yarding and I have only been able to use one this year, there's been such a little bit of getting out.

"Q That is on your show proper, that's not on the highway, the new road?
"A No, that's out in the brush.

"Q What type truck do you have?

"A It's an International, D-246-F.

"Q And how many wheels?

"A Ten wheels.

"Q How many on the back?

"A Eight.

"Q Is that a trailer and truck or is that just a truck?

"A No, it's what we term a solo rig."

We come now to the testimony which reveals the change in the condition of the road following the commencement of the defendant's logging operations. Bruce Miller, who had worked for the plaintiff from April to August, 1952, testified for the plaintiff:

"Q What was the condition of the road the latter part of May of this year?

"A Well, I would call it just a good trail, or in other words it would be called a good road; that is what it is used for.

\* \* \*

"Q Was it smooth, with reference to the latter part of May?

"A Yes, fairly good road in there. \* \* \*

"Q Did it have loose rock on the surface?

"A Yes, small ones.

"Q Did it have ruts in the road?

"A No.

"Q How recently have you seen the road, Mr. Miller?

"A The first day of the deer season, whenever that was. I don't know the date.

"Q Two or three weeks ago?

"A Yes.

"Q What was the condition of it then?

"A In pretty bad shape.

"Q Can you picture the condition to the Judge?

"A Big loose rock, large rock, chuck holes in it; pretty bad shape. \* \* \* Some places there would be a chuck hole on each side of the road.

Most generally they were on one side of the road where there would be a soft spot. * * * When you come down to the bottom of the hill where the timber comes from there is a chuck hole on each side of the road. That is a pretty bad place. From there on down apiece is clay and the dirt is wore off the top of the rocks and you have your bottom rocks and then you run into more chuck holes further up there.

* * *

"Q Based on your experience in building and maintaining roads, and assuming that no work is done on this road we are talking about this fall, will the road be passable to touring cars during the wet weather and the freezing and thawing weather this winter?

* * *

"A I believe it will be passable, all right, providing you don't tear it up any more than it is."

Donald Parcher, a commissioner of Columbia county, testified for the plaintiff:

"Q Now I would like for you to describe to the Court the condition of the road as you saw it yesterday when you looked at it.

"A Not bad.

"Q Well, can you be more specific about what you mean by 'Not bad'?

"A I went up there in a car and turned around and came back. The road in two places needs repair but it wasn't in bad shape for a narrow road, as narrow as it is.

* * *

"Q Now you mentioned that the road as you saw it yesterday needs some repair. By needing repair do you mean in order to make it travelable this winter, or what do you mean?

"A You mean, what kind of travel?

"Q Well, light travel, passenger cars, pickup trucks, that sort of things.

"A It would need some rock on it in order

to make it passable for this winter. * * * I would say about 20 loads, or a hundred yards."

The plaintiff gave this testimony:

"Q I would like you to describe to the Court the condition of this road just before Nys started using it this year.

"A The road was not badly rutted and the railroad grade that we object to particularly was in quite good shape, had no large loose rock on it and it was passable and in a great deal better shape than now. I wouldn't like to say that it was a good road; it was solid and substantial, not full of loose rock, not badly rutted, the wheel tracks were not so deep that it would have been necessary to have any rock to speak of on the hills, on the steep grades, other than the filler."

Charles D. Erickson, one of the intervenors, said:

"Q Was there any change in the appearance of this road from June until day before yesterday?

"A No, I don't think there is.

"Q There has been some testimony there is lots of loose gravel all over the railroad right of way.

"A That road was never rolled. There's always been loose gravel on it.

"Q And were there any rocks that would interfere with the operation of a truck or of an automobile?

"A No.

"Q Is the road full of big holes, chuck holes?

"A No, it isn't. There's little bumps in it because it's a coarse gravel road, that's all.

* * *

"Q What means of transportation did you use?

"A I have a little pickup. And I often go in my Olds.

"Q Did you have any trouble with your pickup, going up there?

"A No."

The defendant Nys testified as follows:

"Q How would you compare the condition of the road east through the Apiary-Nehalem Valley Road from where the Nys road is to that portion of the Nys road west to Van Natta's property?

"A I would say that that road from the Nehalem Valley Road up to where my road turns off there is in better shape than the other road is."

In order to facilitate an understanding of that answer, we revert to a fact which we have already mentioned; that is, that the CCC road enters, for a short stretch, upon the plaintiff's property. At that point the defendant Nys built a by-pass which avoids the plaintiff's property and the section of the CCC road which lies upon it. Evidence indicates that the parts of the CCC road which cross Ericksons' property are in better condition than the part which lies upon the plaintiff's property. Nys' testimony continued as follows:

"Q Do you know anything about a lot of loose rock on the railroad grade where there wasn't any before?

"A I can't notice that. It is down to, even stock or something else kicked those rock up there. Those rocks may be four inches through or something like that. Stock and deer and everything else kick chunks in the road and you wonder how they get in there. As far as there being a whole bunch of deep loose rock, it isn't there. It's a rock here and a rock there and a rock some place else.

\* \* \*

"Q Is there anything there interfering with the road now that would interfere with the operation of a vehicle or an automobile or a truck on a little road of that kind?

"A No, not any more caution than you would use on some of the County roads."

We have mentioned that fact that the parts of the CCC road which crossed the Ericksons' land were in better condition than the part which lay upon the plaintiff's. Concerning that fact, the plaintiff testified:

"A Well, the gentleman has said that the road is worse where Mr. Nys didn't use it on, than it is from there to the creek, which is not just entirely untrue. That road that Mr. Nys is using and that we are particularly litigating about was always a better road than I have from thereon, from the Nys road on."

The following pertains to the feasibility of using the road for logging purposes. We shall resort first to testimony given by Donald Parcher, the county commissioner, from whom we quoted in a preceding paragraph. His following answers referred, in the first instance, to the condition of the road as it was before the county sold the tract which the plaintiff now owns, and, next, to the condition of the road as it was after the county had performed some work upon it; that is, shortly after the plaintiff made his purchase.

"Q Was it, in your opinion, suitable in construction for a logging road? I mean by that, suitable for logging trucks to haul logs over?

"A In the summer time, yes.

"Q How about the winter time?

"A No.
\* \* \*

"Q Now after you had done that work, ditching and grading the road and putting rock on it, what kind of a road was it then? Did that make it a logging road?

"A In the summer time, yes.

"Q And how about the winter time?

"A No."

The plaintiff testified:

"Q Mr. Van Natta, would you explain to the Court the necessity for this road which is the subject of this suit?

"A  *  *  *  Of course, for ordinary living, for the kind of farming that I engage in, and for what small amount of logging I do, I have to have a way that I can use at all times a year.

*  *  *

"Q Did you use this road in dispute all summer yourself, for hauling your own logs?

"A Well, not all summer, Mr. Bond.  *  *  * The principal portion of our hauling was completed in July."

Charles D. Erickson testified:

"Q At the time of the contracting with Nys to do selective logging for you was Van Natta using this road?

"A Yes.

"Q And what was he using it for?

"A Logging and traveling over it."

We again turn to the defendant Nys:

"Q Has there been any traffic on this highway besides your logging truck?

"A Yes.

"Q Has Mr. Van Natta sent some logging trucks through there?

"A Yes."

Since the plaintiff himself has used the road for log hauling, it is clear that the road is suitable for that purpose. From the foregoing testimony, it appears that the defendant Nys used only three pieces of vehicular equipment in his logging operation. It also appears that in the months before the suit was filed, the road deteriorated to some extent but was still passable for light traffic when the trial occurred. It

will be observed that the testimony given by the plaintiff's witnesses was conflicting as to whether the road needed repair to make it travelable for automobiles during the wet winter season. There was evidence that the road cannot be used for the transportation of logs in that season and that it would become impassable if subjected to use by log trucks in that period. However, Nys indicated that he had no intention of using the road when the weather became unsuitable. He swore:

"Q  Did you tell Mr. Van Natta that you were intending to operate, to log on the Erickson property all winter?

"A  Well, I believe he was correct about that. What was his statement on it?

"Q  His statement was that you told him you intended to log on the Erickson property all during the winter if the weather and conditions permitted.

"A  If the weather permitted, yes."

The above suffices as a statement of the controlling facts.

■ We have previously said that an owner of land, upon which an easement of way is imposed for the benefit of another, may also use the way if his use does not unreasonably interfere with the rights of the easement owner. Therefore, the issue which this case presents is this: Does the use of a way by the owner of the servient tenement to such an extent that it contributes to the way's deterioration, but leaves it intact for use by the owner of the dominant tenement, interfere with the rights of the latter to such a degree that an injunction should issue upon the application of the owner of the dominant tenement.

■ The general rule which governs the problem is stated in the two following passages which we take

from 17 Am Jur, Easements. Section 152 of that work says:

"It is well settled that the due enjoyment of easements may be protected by injunction against interference, encroachment or obstruction issued within the discretion of the court, provided the plaintiff has no adequate remedy at law. The bare fact that an action for damages will lie at law does not preclude injunctive relief in this situation. * * *"

Section 153 sets forth:

"As heretofore shown, an action at law lies to recover damages for the obstruction of a right of way. In many cases relief by injunction has been granted and held to be a proper remedy for an interference with a right of way. In other cases, while relief in equity by injunction has been denied, injunction has been stated to be the proper remedy where grounds for equitable interference exist. Although there has been such a variance in the opinions rendered in respect of the grounds of equitable relief that caution must be exercised in formulating general rules, it appears to be an accepted principle that injunction is a proper remedy for an interference with a right of way whenever the injury complained of is irreparable, the interference is of a permanent and continuous character, or the remedy at law, by an action for damages, will not afford adequate relief. * * *"

See, also, 28 CJS, Easements, § 107, p 788.

Many of the cases in which an injunction was permitted involved situations wherein the right of way was obstructed by the erection of physical structures. In *Buckley v. Maxson,* 120 Conn 511, 181 A 922, the obstruction was a stone fence; in *Haffner v. Bittell,* 198 Ky 78, 248 SW 223, a fence; in *Gillette v. Van Horn,* 36 SW2d 305, a fence; and in *Lindsey v. Shaw,* 210 Miss 333, 49 So2d 580, terraces, tree branches and

locked gates. The parties do not disagree upon the proposition that an injunction must issue to prevent an unreasonable use of the way which substantially impairs its condition. The disagreement is as to whether the impairment in this case is unreasonable.

*Herman v. Roberts,* 119 NY 37, 23 NE 442, tends to support the position of the plaintiff, but we think that the material circumstances there are different from those in the present case. There the owner of the dominant tenement had an easement of way over the defendant's land to a residence which was used as a gentleman's country seat. The defendant, owner of the servient tenement, was enjoined from using the way in connection with his farming activities in a manner which cut up the bed of the road and materially restricted passage over it. The following appears in the opinion of the case:

"* * * the evidence * * * tended to show that the defendant had cut up and injured the road-bed by drawing heavy loads over it, and placing stones thereon which obstructed the passage. * * *

"* * * It is apparent from the character of the property affected, and the use to be made thereof, that the plaintiff expected to construct a carriage road for access to and communication with his residence as a gentleman's country seat. It could not have been contemplated by the parties that such a road was to be used for farming purposes, * * *. The land over which the road was laid out had never before been so used, * * *. The land itself was of small compass, and little value, as it was hilly, rocky, sterile, and unadapted to agricultural uses; and it could not, under the circumstances, have been intended that the road was to be built and used to any considerable extent for farming purposes by either the grantor or the grantee. * * * It is difficult, if not impossible, to lay down a clear and definite line of use which shall

enable the parties always to determine what may be considered a proper and reasonable use, as distinguished from an unreasonable and improper one, * * * ''

In *Giles v. Luker,* 215 Minn 256, 9 NW2d 716, the plaintiff, owner of a gravel pit and an easement of way over the defendant's adjacent property, sought an injunction restraining the defendant from interfering with the plaintiff's use of the way. The defendant, who used his property partly as a summer resort, in turn prayed for an injunction against the plaintiff's use of the way with gravel trucks. He contended that the trucking operations damaged the road irreparably and were destructive of the defendant's summer resort business. The trial court sustained the defendant's contentions and issued him an injunction. Upon appeal, the decision, written by Justice Loring, modified the trial court's decree and held that, under restricted conditions, the plaintiff was entitled to operate her gravel trucks. The court's reasoning is enlightening:

" 'The right of the easement owner, and the right of the landowner, are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both.' Minto v. Salem W., L. & P. Co., 120 Or 202, 212, 250 P. 722, 725; Olcott v. Thompson, 59 N.H. 154, 156, 47 Am.Rep. 184. Therefore, while the plaintiff here has a right to have her gravel hauled over the road reserved to her property, she must exercise that right reasonably, without doing unnecessary injury to defendant's property or business. His principal objection to the haulage of gravel is that it will create dust, to the detriment of the use of his summer cottages, and that the noise of the trucks, running nights as well as days, will keep the lessees of such cottages from sleeping. He also suggests some danger to children from the passage of the trucks, a hazard common to all properties adjacent to highways.

"On this record, the order granting an injunction against plaintiff must be modified so as not to restrain her from trucking gravel at other times than during the sleeping hours of the nights of the summer resort season. Such use of the road by her should be conditioned upon her either sprinkling it immediately adjacent to defendant's cottages or treating it with chemicals so as to minimize the dust created by this haulage. The speed of the trucks past such cottages should be limited to a reasonable one. She should also be required to repair all damage done to the road by the gravel trucks. On the other hand, plaintiff is entitled to an injunction restraining defendant from interfering with the haulage of her gravel under the conditions above set forth.

"The case is remanded to the trial court with instructions to enter a decree only enjoining plaintiff from having her gravel hauled between ten p.m. and six a.m. of each day from May 15 to September 15 of each year, but requiring her to minimize the dust on the road immediately adjacent to defendant's cottages by sprinkling or chemical treatment and to repair all damage done to the road by the gravel trucks. The speed of such trucks in the immediate vicinity of defendant's cottages should not exceed eight miles per hour. Defendant is to be enjoined from interfering with such use of the road by plaintiff or her customers."

The Herman decision indicates that an easement of way cannot be put to uses which were not in contemplation when the grant was made and which are otherwise unreasonable. In that case, the rocky and unpromising character of the surrounding areas gave no hint that the owner of the servient tenement would ever seek to use the way for agricultural purposes. Further, his use of the way for agricultural purposes would defeat the object of the grant. The reasonableness of any use is dependent upon the attendant circumstances.

That fact influenced and shaped the relief which was granted in the Giles case. In the case at bar, consideration must be given to the nature and composition of the terrain over which the road traverses and, likewise, to the probable uses to which the surrounding tracts of land can be put. If, in view of all the attendant circumstances, the use to which the servient tenement proposes to subject the road is a reasonable one, will not destroy the road and will not deprive the easement owner of the degree of use to which he is entitled, an injunction will not issue against him. In the present instance, the road was used in the past for the transportation of logs. Even before the CCC road was built the route was that of a logging railroad. The plaintiff himself uses the road for log hauling. It is evident that if the road is kept in repair, its use for log transportation is a reasonable one and is one which could have been foreseen when the parties purchased their present holdings. The areas which surround the road are useful principally for the production of timber and, obviously, the logs produced in the area have to make their way to market. This road is clearly a logical route for them. We are satisfied that the extent to which the respondents used the road was not unreasonable.

If the defendant's use of the road contributes to its depreciation, the appropriate remedy for the plaintiff is a decree requiring the defendant to bear a proportionate share of the expense of maintaining the road. The appropriate remedy, in our opinion, is not injunction.

We shall now give attention to the manner in which provision may be made for the maintenance of the road and distribution between the parties of the resulting expense.

*Bina v. Bina,* 213 Ia 432, 239 NW 68, which involved the rights of the dominant and servient landowners in the use of a road, declares:

> "There still remains a question concerning the amount of work and labor each party is to perform, and the extent of money outlay to be made by him in thus repairing the easement. Nothing in the grant of the easement determines the question of how the burden of repairs shall be distributed. Both litigants use the common way. Such was the contemplation of the grantors. By thus using the private road, each tends to cause the same to become unfit for the contemplated travel by the other. Mathias Bina, the appellee and easement owner, might repair the way and the appellant thereafter by use make the road unfit again for travel. A distribution of the burden of repair between the appellant and the appellee Mathias Bina would be equitable and just. See Kepler v. Border (179 Iowa, 318, 161 N. W. 302), supra. Consequently under the circumstances such distribution should be made.
>
> "It appears from the record that the appellant does not use the private road so much as does the appellee Mathias Bina. Appellant, therefore, should bear a correspondingly lower proportion of the repair burden than that imposed upon the appellee Mathias Bina. Of course, an exact distribution of the expense and labor necessary to make reasonable repairs cannot be accomplished. An approximation only is all that can be achieved."

See, also, *Stevens v. Bird Jex Co.,* 81 Utah 355, 18 P2d 292; *Imbriaco v. Engel,* 112 NJ Eq 253, 163 A 657; *Lamb v. Lamb,* 177 NC 150, 98 SE 307.

As we have seen, one of the plaintiff's assignments of error complains because the trial court did not award him "compensatory damages." Difficulties in making an award arise out of the fact that the record contains inadequate data and the plaintiff's aversion

to the remedy which appears to be the most appropriate. His brief says:

> "We oppose a solution of the problem presented by the case at bar by any scheme looking toward a sharing of the future burden of maintenance and repair, such as by a declaratory judgment, or a mandatory injunction commanding a division of the burden of repair based on ton-miles traveled, or percentage of use. Such an arrangement would be beyond the supervisory facilities of a court, would retain a condition endangering human safety, and would solve nothing, but would kindle litigation in requiring plaintiff to bring repeated court proceedings in an attempt to extract from intervenors their share of the burden."

The plaintiff testified:

> "I think that the road broke because of two or more factors. I think it broke because of excessive loads and a complicating factor of a dry year. The finer material or binding material has disappeared. Either it has gone to dust and been blown away or has been driven into the ground by the truck tires * * *."

His brief says:

> "Lest we should be accused by our opponents of claiming that defendant's use of the road is solely responsible for its condition, we desire to say that we are making no such claim. No doubt the 10% or so of use by plaintiff had a contributing effect."

Although the record contains evidence that might be used in computing the cost of restoring the road to its former condition, it offers no basis for segregating the injury which each party inflicted. If we accept the plaintiff's statement, which, seemingly, has little support in the record, he hauled at least 12 loads of logs upon the road in the period in which the defendant

Nys hauled 114. That information alone is insufficient to apportion the cost of restoring the road.

The respondents, as we have held, are entitled to make reasonable use of the road. Accordingly, the parties will have to find a means of adjusting their difficulties which arise out of the apportionment of the cost of restoring the road and its maintenance. Seemingly, the plaintiff will have to overcome his dislike of the means of apportionment which appear most suitable, or, in lieu thereof, find a substitute remedy. His fears for the safety of his family while its members travel upon the road are natural, and possibly some protective measures similar to those in *Giles v. Luker* may be included in the eventual decree.

■ In a case of this nature, the damages caused by each party cannot be ascertained with precision. Every rut and every chuckhole need not be traced to the activities of one of the parties. A reasonable approximation of the wear and tear caused by each is all that can be sought. The cost of restoration and the expense of future maintenance of the road must be apportioned between the owner of the dominant tenement and the owners of the servient tenement upon some basis, such as tonnage or board feet hauled. Possibly the parties or the trial court may know of an alternative to those standards of apportionment. The defendant Nys is jointly and severally liable with the Ericksons for the amount of expense that is attributable to the owners of the servient estate during the period when he used the road.

The case is remanded to the circuit court in order that it may enter the proper decree. If further testimony needs to be taken, the court has the power to take it.

Affirmed as modified.

*D. C. Bond,* Portland, and *George G. Van Natta,* St. Helens, attorney pro se, for the petition.

*Leo Levenson, Norman B. Kobin* and *W. J. Prendergast, Jr.,* Portland, contra.

ROSSMAN, J.

The plaintiff-appellant has filed a petition for a rehearing which is accompanied with a short brief. The latter, referring to our opinion, says:

> "The court has laid great stress on the assumption that plaintiff claims the right to exclude respondents from the roadway. We feel that this erroneous assumption so prejudiced plaintiff, that the court's opinion should be reconsidered in the light of plaintiff's true position."

Although the plaintiff-appellant averred in his complaint that he was "the exclusive owner" of the road which is the subject matter of this suit, we did not, in our consideration of the issues, assume that the plaintiff claimed the right to exclude the respondents from the road. The record evidenced the plaintiff's fears that the Ericksons' log truck, passing along the narrow, winding road, might injure the plaintiff's family when its members ventured upon the same throughfare, yet it was clear to us that the plaintiff realized that he could not bar the respondents from the road. We engaged in no erroneous assumption of the kind which the petition for a rehearing attributes to us. In our efforts to analyze the contentions and rights of the parties, we sought to envision the various situations, but we never surmised that the plaintiff claimed that he alone could use the road.

Although we do not believe that our opinion supports the view which the plaintiff-appellant ascribes to it in the above-quoted passage, we deem it will, since this cause has been remanded to the circuit court for further attention, to set at rest all misunderstanding.

All contentions advanced in the petition for a rehearing have received careful attention. The petition is denied.